CHEMICAL LEAMAN TANK LINES, INC., Plaintiff,

v.

UNITED STATES of America and Interstate Commerce Commission, Defendants,

The Atchison, Topeka and Santa Fe Railway Company, et al., Intervening Plaintiffs.

Civ. A. No. 4419.

United States District Court, D. Delaware.

Dec. 19, 1973.

Daniel M. Kristol, of Killoran & Van Brunt, Wilmington, Del., Leonard A. Jaskiewicz, and Ronald N. Cobert, and Ira G. Megdal, of Grove, Jaskiewicz & Gilliam, Washington, D. C., for plaintiff.

Ralph F. Keil, U. S. Atty., Wilmington, Del., John H. D. Wigger, Dept. of Justice, Washington, D. C., for defendant United States.

Seymour Glanzer, Atty., I. C. C., Washington, D. C., for defendant Interstate Commerce Comm.

William Prickett, of Prickett, Ward, Burt & Sanders, Wilmington, Del., Joseph D. Feeney, Gen. Sol., Western Railroad Assn., Chicago, Ill., Robert B. Batchelder, Omaha, Neb., Richard M. Gleason, St. Paul, Minn., John J. Paylor, Baltimore, Md., for intervening Railroad plaintiffs.

Daniel M. Kristol, of Killoran & Van Brunt, Wilmington, Del., Eugene T.

Liipfert, of Verner, Liipfert, Bernhard & McPherson, Washington, D. C., for intervening plaintiff National Tank Truck Carriers, Inc.

Daniel M. Kristol, of Killoran & Van Brunt, Wilmington, Del., Patrick H. Smyth, and Daniel C. Sullivan, of Singer & Lippman, Chicago, Ill., for intervening plaintiff Schneider Transport, Inc.

Before SEITZ, Chief Circuit Judge, LATCHUM, Chief District Judge, and STAPLETON, District Judge.

## OPINION

STAPLETON, District Judge:

This suit challenges the validity of an order entered by the Interstate Commerce Commission in a rulemaking proceeding formally entitled Ex parte No. MC–85, Transportation of Waste Products for Re-use and Recycling (General Motor Carrier Licensing), 114 M.C.C. 92 (1971). We refer to this order as MC–85. In essence, MC–85 provides for the issuance of operating authority, pursuant to a Special Certificate of Public Convenience and Necessity, to any motor carrier desiring to transport "waste" commodities in furtherance of "a recognized pollution control program" upon a finding by the Commission that he is qualified to do so. Plaintiff and intervening plaintiffs (collectively "plaintiffs") are rail and motor carriers and their industry representatives who are now certified to transport products that are arguably "wastes" within the purview of MC–85. They mount a broadside attack on MC–85, alleging principally that it exceeds the statutory power of the Commission, is arbitrary and capricious, and is the product of a procedurally defective administrative proceeding. As required by 28 U.S.C. §§ 2284(1) and 2325, a three-judge court was convened to review the Commission's conduct. We hold that MC–85 constituted improper action by the I.C.C. and, accordingly, we remand it for further Commission proceedings.

## I. THE FACTUAL BACKGROUND.

### A. The Origin And Passage Of MC–85.

The Commission initiated MC–85 on December 21, 1970 for the purpose of inquiring whether it could contribute to the national recycling effort by "removing the regulatory hindrances" faced by motor carriers of waste commodities. 114 M.C.C. 103. Acting under the rulemaking authority purportedly granted it by the Motor Carrier and Administrative Procedure Acts, the Commission published notice of its proposed rule, together with policy exposition and accompanying data, in the Federal Register on January 15, 1971. The notice advised that oral hearings were not contemplated but that interested parties could participate by submitting written statements.

Plaintiffs and others petitioned the Commission to modify its projected rulemaking procedure. Chemical Leaman Tank Lines and the National Tank Truck Carriers individually sought oral hearing. The Western Railroad Traffic Association and numerous motor carriers—among them intervening-plaintiff, Schneider Transport—urged the Commission to publish a list of participating parties and to accept replies to those statements already submitted. Citing the limited procedural machinery appropriate to rulemaking as well as the pressure for expeditious Commission action, the ICC declined to make these adjustments. 114 M.C.C. 102.

The publication in the Federal Register evoked 177 responses to MC–85. Unqualified support for the proposed rule was expressed by 63 motor carriers and 76 other disparate interests, including labor unions, trade associations, ecological groups and manufacturers who either use or create such recyclable materials as glass, textiles, rubber and metal scraps. Various degrees of opposition were expressed by 26 parties, typically presently certificated carriers, both rail and motor.

On September 30, 1971, the Commission determined that, with slight modification, its proposed rule should be adopted and ordered it to become effective on December 15, 1971. However, the operation of the order was stayed by the filing of petitions for reconsideration by the railroads, the Institute of Scrap Iron and Steel, several motor carriers individually and two motor carrier associations. On February 16, 1972, the Commission declined to order reconsideration and designated March 20 as the effective date for MC–85. On March 13, 1972, the Western Railroads petitioned the Commission to stay MC–85 once again. The Commission rejected this petition as successive and therefore improper under its General Rules of Practice.

Shortly thereafter MC–85 took effect.

### B. *The Substance Of MC–85.*

As the Commission itself concedes, MC–85 represents a sharp departure from the ICC's customary practice of establishing "public convenience and necessity" only in an adjudicatory framework. Under prior Commission procedure, individual applicants for carrier certification were required to demonstrate that their proposed operations would serve "the public convenience and necessity." In MC–85, the Commission has removed that issue from the realm of individual litigation. Since MC–85 contains a general, prospective finding of "public convenience and necessity" for all qualified carriers, individual applicants for certification need only demonstrate that they will transport an eligible waste product pursuant to a "recognized pollution control program," and that they comply with the usual Commission tests for carrier fitness. MC–85 requires that an application for a special certificate be accompanied by a copy of the carrier's tariff which must specify the territory or points to be served, the commodities to be transported and the rates to be charged. The authority granted by a special certificate is the authority to transport "between all points as indicated in appropriately filed tariffs in the transportation of 'waste' products for recycling or reuse in furtherance of recognized pollution control programs." 114 M.C.C. 110.

The Commission's own language offers an accurate overall characterization of the certification scheme MC–85 envisions. MC–85, says the Commission, "stream(lines) our present motor carrier licensing procedures insofar as they relate to the for-hire transportation of waste materials for recycling or reuse by means of a general finding of public convenience and necessity, of which interested persons could avail themselves through a simplified filing." 114 M.C.C. 93.

The heart of MC–85, and a persistent focus for controversy among the parties herein, is its definition of two pivotal concepts: "waste product" and "recognized pollution control program." We reproduce the Commission's relevant discussion of these terms in full:

"Waste" products.—We are authorizing the transportation of "waste" products for recycling or reuse in furtherance of recognized pollution control programs. "Waste" products shall include any product which has been or would ordinarily be discarded as worthless, defective, or of no use. (See Webster's Seventh New Collegiate Dictionary, G. & C. Merriam Co., Springfield, Mass., 1967). The key word in this definition is "discarded." For if the product has not been or would not ordinarily be discarded, then it will not meet the criteria of being a "waste" product for the purposes of this proceeding. We are not proposing to provide additional transportation for shippers creating waste and scrap, and desiring to recycle or reuse it, in the ordinary course of their business. Rather, we desire to alleviate the problem of litter and potential litter by enabling and facilitating the expeditious and economical reclamation of discarded or to-be-discarded objects and restoring them to the manufacturing cycle. Ex-

amples of what would meet our criteria of waste and what would not follow: (a) a textile manufacturer has regular arrangements to transport defective materials and scraps to a bedding manufacturer for reuse. Such procedures are in the ordinary course of the shipper's business, the shipper has created the scrap, and the products have not been and would not ordinarily be discarded. Therefore, a motor carrier becoming a party to the Special Certificate of Public Convenience and Necessity granted herein would not be authorized to transport shipments of this nature; (b) if a private citizen has textile products (drapes) which he desires to discard, then the reclamation of commodities of this kind for the purposes of recycling or reuse are within the scope of the general authority being issued in this proceeding. These products would meet the test established in the commodity description that "waste" products must be intended to be reused or recycled in furtherance of recognized pollution control programs. 114 M.C.C. 107.

\* \* \* \* \* \*

A recognized pollution control program shall be any organized and regular campaign against litter. It is not necessary that the campaign be sponsored by Government or industry. The program should have goals, standards to achieve such goals, and personnel continuously engaged in the pursuit of these goals. Such personnel do not have to spend any particular portion of each day on pollution projects, but should be regularly responsible for advancing the goals of any antipollution program. This definition would include charitable groups, individual businesses, Government, industry, trade associations, conservation groups, and any other person or group meeting these criteria. The campaign should be on a regular basis; whether daily, weekly, or even monthly is unimportant. . . . 114 M.C.C. 107–108.

The Commission also included within the scope of traffic authorized by MC–85 "processed waste" materials—or waste *en route* from various stages of the recycling process back into the manufacturing process. The Commission offered the following rationale for this decision:

Processed "waste" materials.—The shippers supporting the adoption of the proposed rules express a need for transportation services from reclamation centers to recycling plants and manufacturing plants, and from recycling plants to manufacturing plants. The "waste" products are not returned to the manufacturing cycle until delivered in a usable state to a manufacturing plant. Delivery of these "waste" materials to a recycling center represents merely a transitional step necessary for the eventual reuse of the commodities. Initial processing at these recycling centers such as grinding, crushing, or compacting does not remove the commodity from our definition of "waste" products.

. . .

As we have already noted, the Commission's order provides that individual carriers desiring to commence operations under MC–85 must file statements attesting that they plan to transport a qualified waste commodity in furtherance of a "recognized pollution control program," and that they satisfy a host of ICC requirements pertaining to carrier fitness, financial responsibility and safety. In contrast with conventional Commission practice, MC–85 does not require Federal Register publication of pending applications for carrier authority. Nor does it prescribe a hearing or other procedure by which presently certificated carriers or members of the public can support or refute the factual claims which individual applications assert.

C. *The History Of This Suit.*

The suit has been engendered by the disquieting experience of presently cer-

tificated carriers in the interval since MC–85 was first enacted. The specific event which motivated plaintiffs to seek our relief was the ICC's grant of MC–85 authority to Lemmon Transport Company, which planned to transport "TNT Red Water" between all points in several Mid-Atlantic and Southern states. In its application, Lemmon averred that "TNT Red Water" had previously been burned as waste but now could be employed in a paper manufacturing process and, therefore, should be classified as a "waste product." Without publishing Lemmon's application in the Federal Register or otherwise soliciting the views of other carriers, the Commission found Lemmon eligible to operate on June 30, 1972 and assigned it Special Certificate P–11–72. Subsequently, the plaintiff in this case, Chemical Leaman Tank Lines, Inc., which had been transporting TNT Red Water from Virginia to North Carolina, was notified by the shipper that Lemmon would thereafter care for its needs.

On July 17, 1972, plaintiff moved in this Court for a temporary restraining order barring operation under Lemmon's special certificate. Plaintiff also' filed a complaint challenging the validity of MC–85. On July 19, 1972, we granted plaintiff temporary injunctive relief. Shortly thereafter, Lemmon asked the ICC to cancel its Special Certificate and the Commission obliged by rescinding Lemmon's participation. On November 7, 1972 this Court dissolved its temporary restraining order.

In its brief, the Commission disavows its action in the Lemmon proceeding, frankly conceding that TNT Red Water was not a waste commodity and that Lemmon did not propose to transport it pursuant to a recognized pollution control program.

Since the issuance of MC–85, plaintiffs and the Commission inform us that 58 applications for certification under MC–85 have been granted. The Commission acknowledges that no notice of these applications was published in the Federal Register and concedes that in no instance has the Commission held a hearing or solicited comments before reaching decision. Plaintiffs submit that at least some of the certificates granted by the Commission repeat the Lemmon pattern; they cover, plaintiffs assert, products with established industrial uses which are now being transported by existing carriers.

Despite the termination of the Lemmon controversy, plaintiffs continue their attack on MC–85 and the Commission's procedure for issuing operating authority thereunder.

## II. PLAINTIFFS' ARGUMENTS AGAINST MC–85.

The plaintiffs' arguments divide into two categories. In the first category fall the plaintiffs' procedural and substantive attacks on MC–85 itself. The plaintiffs would have us consider MC–85 infirm in four respects. First, they allege that MC–85 conflicts with both the Administrative Procedure Act and the regulatory scheme prescribed by the Motor Carrier Act. Congress, they urge, contemplated the issuance of a certificate of public convenience and necessity only after consideration of an individual application and only in an adjudicatory setting; it did not authorize the Commission to enter a generalized, prospective finding of public convenience and necessity. Second, plaintiffs submit that, even if such a generalized finding if theoretically permissible, MC–85 must still be faulted as unreasonable, arbitrary and capricious. Third, the plaintiffs claim that the Commission failed to accord them a sufficient opportunity to be heard during its consideration of MC–85. Fourth, the railroad plaintiffs contend that the ICC ignored the clear mandate of the National Environmental Policy Act by omitting to prepare an Environmental Impact Statement.

The plaintiffs' second category of arguments allege defects in what they aptly term "Phase II" of MC–85: the Commission's mechanism for processing in-

dividual applications for carrier authority under MC–85. On the hypothesis that MC–85 itself is neither substantively nor procedurally invalid, they maintain that the Commission has still been remiss in denying presently certificated carriers notice of and an opportunity to contest pending applications for MC–85 authority. Accordingly, they ask us to direct the Commission to institute a reasonable notice and intervention procedure to assist its daily administration of MC–85 guidelines.

We address each category of arguments in turn.

## III. THE VALIDITY OF MC–85 ITSELF.

### A. *The Commission's Statutory Power To Issue MC–85.*

The Commission relies heavily on its acknowledged rulemaking power as support for its authority to promulgate MC–85. It reminds us that the Supreme Court has construed Section 204(a)(6) of the Motor Carrier Act as a grant of broad, substantive rulemaking power, "coterminous with the scope of agency regulation itself." American Trucking Associations v. United States, 344 U.S. 298, 311, 73 S.Ct. 307, 311, 97 L.Ed. 337 (1953). Moreover, the Commission stresses that the courts have long been sensitive to the advantages which rulemaking offers the administrative process. American Airlines v. Civil Aeronautics Board, 123 U.S.App.D.C. 310, 359 F.2d 624 (1966). We are mindful of both of these propositions as well as of the related proposition that an agency's choice to substitute a prospective declaration of policy for a case-by-case development of that policy is entitled to great judicial deference. SEC v. Chenery Corp., 332 U.S. 194, 202–203, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947).

Nevertheless, our recognition of the considerable rulemaking power of the ICC and the favored status of administrative rulemaking generally cannot alone establish the validity of MC–85. The Commission's discretion to proceed by rulemaking is "geared to and bounded by the limits of the regulatory system of the Act which it supplements." *American Trucking Assn., supra,* 344 U.S. at 313, 73 S.Ct. at 316. Thus, we must test both the Commission's choice to employ rulemaking in MC–85 and the scope and substance of the actual rule it has adopted against the Administrative Procedure and Motor Carrier Acts. If MC–85 is in conflict with either statute, we must set it aside.

The plaintiffs see several such conflicts. They believe neither the Motor Carrier nor Administrative Procedure Acts permit the Commission to make a prospective finding of public convenience and necessity for a broad class of motor carrier traffic. Rather, they argue that the Commission must conduct a case-by-case examination of public convenience and necessity, addressing that issue only when an individual carrier proposes for Commission approval the movement of defined commodities over defined routes. According to the plaintiffs, the Administrative Procedure Act compels this adjudicatory approach because a finding of public convenience and necessity is equivalent to a licensing grant and, under the APA, it is claimed, a license can only be issued in an adjudicatory proceeding. This adjudicatory approach, the plaintiffs urge, is likewise dictated by the language and philosophy of the Motor Carrier Act. They contend that, properly read, several sections of that Act require the Commission to evaluate public convenience and necessity only when an individual motor carrier applies for operating certification. Alternatively, the plaintiffs argue that even if the text of these sections does not expressly forbid a prospective finding of public convenience and necessity, that prohibition is implied by the spirit and purpose of the Act, analyzed in light of the regulatory aims Congress expected the Commission to achieve. In the same vein, they contend that such a finding operates as a "de-regulation" of an entire class of commodities—i. e., wastes—and, as such, grants an exemp-

tion from the Motor Carrier Act. The creation of an exemption from regulation, reason the plaintiffs, is strictly a Congressional function.

## 1. *The Administrative Procedure Act.*

■ We cannot agree that MC–85 is incompatible with the Administrative Procedure Act. It is not, as plaintiffs suggest, adjudication in a rulemaking disguise; nor is it "licensing" within the meaning of that Act.

Under the Administrative Procedure Act ("APA") the procedure required for administrative action depends, in part, upon whether the action is a "rule" or an "order". A rule is defined in the Act as an "agency statement of general or particular application and of future effect designed to implement, interpret, or prescribe law or policy." "Rulemaking means agency process for the formulation, amendment or repeal of a rule." An order is defined as "the final disposition . . . in any matter other than rulemaking but including licensing." "Agency process for the formulation of an order" is called "adjudication." 5 U.S.C. § 551.[1]

The APA's distinction between rulemaking and adjudication was intended in large part as a codification of existing law and practice.[2] In construing the Act against this background, as well as in delineating the requirements of procedural due process, the courts have recognized a general dichotomy between agency action which declares a policy for uniform prospective application among an appropriately defined class[3] and agency action which is based upon an examination of individual conduct or situation and establishes individual rights, liabilities or status.[4]

As with most generalizations, articulation of this basic distinction leaves ample room for debate about the appropriate classification for any specific situation. The touchstone for hard cases, we believe, lies in the recognition that the objective of the APA, as well as the objective of the courts in fashioning due process standards in this area, is to prescribe procedures appropriate to the agency's task.[5] Some issues lend themselves to resolution by adjudication; others do not. The adversarial approach of adjudication is particularly helpful when an agency examines the affairs of a single party or set of parties, and fairness and accuracy demand that those parties receive a full opportunity to submit relevant evidence in their favor and rebut the evidence against them. When, however, the agency must evaluate the interaction of numerous forces and conditions, it is both sensible and desirable for the agency to employ the procedures which the APA designs for rulemaking, for the limitations of the adjudicatory process may hinder, rather than advance, the agency's search for relevant information.

Judge Friendly noted this relationship between the character of the issue addressed and the appropriate form of administrative process in WBEN v. United States, 396 F.2d 601, 618 (2nd Cir. 1968):

. . . Adjudicatory hearings serve an important function when the agen-

---

1. Subsections 551(8) and (9) also provide: "license" includes the whole or a part of an agency permit, certificate, approval, registration, charter, membership, statutory exemption or other form of permission; "licensing" includes agency process respecting the grant, renewal, denial, revocation, suspension, annulment, withdrawal, limitation, amendment, modification, or conditioning of a license;

2. Ginnane, " 'Rule Making,' 'Adjudication' and Exemptions Under the Administrative Procedure Act." 95 U.Pa.L.Rev. 621 (1947).

3. Based on legislative history, the words "or particular" in the definition of "rule" have not been accorded their literal import. American Airlines, Inc. v. CAB, 123 U.S. App.D.C. 310, 359 F.2d 624, 630 fn. 17 (1966).

4. *E. g.,* United States v. Florida East Coast R. Co., 410 U.S. 224, 93 S.Ct. 810, 35 L.Ed. 2d 223 (1963); American Airlines, Inc. v. CAB, *supra*; Willapoint Oysters v. Ewing, 174 F.2d 676, 693 (10th Cir. 1949).

5. See Duquesne Light Co. v. EPA, 481 F.2d 1 (3rd Cir. 1973).

cy bases its decision on the peculiar situation of individual parties who know more about this than anyone else. But when, as here, a new policy is based upon the general characteristics of an industry, rational decision is not furthered by requiring the agency to lose itself in an excursion into detail that too often obscures fundamental issues rather than clarifies them.[6]

The most recent pronouncement of the Supreme Court in the area reflects a similar recognition. In United States v. Florida East Coast R. Co., 410 U.S. 224, 93 S.Ct. 810, 35 L.Ed.2d 223 (1973) the court reviewed an ICC rulemaking proceeding in which the Commission had examined the "chronic freight car shortage on the Nation's Railroads" and had promulgated a nationwide order requiring payment of "incentive" per diem charges by any railroad using on its lines a standard boxcar owned by another railroad. The Court held that the Commission had complied with the requirements of the APA. It observed:

The basic distinction between rulemaking and adjudication is illustrated by this Court's treatment of two related cases under the Due Process Clause of the Fourteenth Amendment. [I. e. Londoner v. Denver, 210 U.S. 373, 28 S.Ct. 708, 52 L.Ed. 1103 (1908) and Bi-Metallic Investment Co. v. State Board of Equalization, 239 U.S. 441, 36 S.Ct. 141, 60 L.Ed. 372 (1915)]. . . . While the line dividing them may not always be a bright one, these decisions represent a recognized distinction in administrative law between proceedings for the purpose of promulgating policy-type rules or standards, on the one hand, and proceedings designed to adjudicate disputed facts in particular cases on the other.

Here, the incentive payments proposed by the Commission in its tentative order, and later adopted in its final order, were applicable across the board to all of the common carriers by railroad subject to the Interstate Commerce Act. No effort was made to single out any particular railroad for special consideration based on its own peculiar circumstances. . . . The fact that the order may in its effects have been thought more disadvantageous by some railroads than by others does not change its generalized nature. Though the Commission obviously relied on factual inferences as a basis for its order, the source of these factual inferences was apparent to anyone who read the order of December 1969. The factual inferences were used in the formulation of a basically legislative-type judgment, for prospective application only, rather than in adjudicating a particular set of disputed facts.

With these observations in mind, we turn to the specific case at hand. The Commission undertook MC–85 to formulate a transportation policy to aid the national recycling effort. That task required the Commission to examine the interplay of many general forces— among them, the magnitude of the litter problem, the need for additional transportation to solve that problem and the impact of additional transportation on the present structure of the industry.[7]

---

6. See also 1 Davis, Administrative Law, § 7.-02.

7. The issues determined by MC–85 are of a substantially different character from the issues reserved by the Commission for decision when individual applications for operating authority under MC–85 are filed. The distinction corresponds to that drawn by Professor Davis:

. . . Thus an applicant for a license is entitled to a trial type of hearing on issues of fact concerning his qualifications but not necessarily on issues of fact concerning need for the service or conditions in the territory to be served. Legislative facts are often best developed through written presentations, or through an argument type of hearing, as distinguished from a trial. The proper method for meeting adverse legislative facts is often written or oral argument; occasionally convenience calls for rebuttal evidence or cross-examination, but when the facts are

The policies that the Commission has adopted operate universally; they are not individual in impact. Under MC–85, no particular carrier is required to do or refrain from doing anything, nor is the certificate of any particular carrier in any way altered. Although MC–85 may indirectly stiffen the competition which certified carriers must face, no certified carrier is singled out for economic injury as a result of his status or past conduct.

These attributes of MC–85 make it an appropriate subject for rulemaking. They likewise make it apparent that MC–85 does not constitute "licensing" within the meaning of the APA. As the plaintiffs seem to overlook, MC–85 does not grant an operating certificate to any carrier. Carriers who wish to operate under MC–85's general finding of public convenience and necessity must initiate an individual proceeding—termed "Phase II" throughout our opinion—before they can become authorized to commence actual service. The "Special Certificate" which eligible carriers will receive after such a proceeding constitutes a "license." In contrast, MC–85 itself merely declares the general criteria which will help to determine when such a license will be issued.

The distinction between an advance declaration of licensing criteria and the subsequent grant of an individual license is, we believe, dispositive of the plaintiffs' argument. On at least two occasions, the Supreme Court has sustained an agency's power to employ rulemaking for the purpose of declaring general licensing criteria, even though those criteria will influence, and perhaps summarily decide, the fate of later license applications. United States v. Storer Broadcasting Co., 351 U.S. 192,

76 S.Ct. 763, 100 L.Ed. 1081 (1955); Federal Power Commission v. Texaco, Inc., 377 U.S. 33, 84 S.Ct. 1105, 12 L. Ed.2d 112 (1963). The analogies between these cases and MC–85 are compelling. Like the ICC in MC–85, the agency in *Storer* and *Texaco* employed rulemaking to refine into particularized guidelines a statutory licensing standard of the "public interest." Again like MC–85, the guidelines promulgated by the agency served to narrow dramatically the range of issues left to be resolved by individual licensing litigation. Like the plaintiffs here, the opponents of agency rulemaking in these cases unsuccessfully advanced the theory that the agency had thereby violated its duty—imposed by the APA or the applicable agency statute—to adjudicate individual licensing applications. Finally, the Commission in MC–85, like the agencies in *Storer* and *Texaco,* has left the door open to subsequent variances from its general rule in the event that rule has unanticipated consequences for any carrier or group of carriers.[8]

We perceive but one arguable distinction between our case and this Supreme Court authority. Unlike the FCC in *Storer* and the FPC in *Texaco,* the Commission in MC–85 has made an advance declaration that a particular category of additional service is in the public interest, rather than decreed that the public interest forbids authorization of additional service by a defined class of applicants. This distinction does not seem meaningful, however, in this context. A number of courts have applied the *Storer* and *Texaco* doctrine to prospective declarations of licensing criteria that, like MC–85, open the way for new service in the public interest. *E. g.,* WBEN v. United States, 396 F.2d 601 (2nd Cir.

legislative, that is a matter of convenience and not of procedural right.
1 Davis, Administrative Law § 7.20 at pp. 506–507.

8. The Commission extended the following invitation in its Report:
. . . It should be noted in this respect that this is a rulemaking procedure and that if any carrier or group of carriers proves to be adversely affected by our findings in this report, and they can present sufficient evidence of such an adverse effect, the adopted regulations can then be amended. The evidence presently before us, however, does not indicate that such an occasion will arise. . . .

1968); Law Motor Freight, Inc. v. CAB, 364 F.2d 139 (1st Cir. 1966); American Airlines, Inc. v. CAB, 123 U.S.App.D.C. 310, 359 F.2d 624 (1966); Logansport Broadcasting Corp. v. United States, 93 U.S.App.D.C. 342, 201 F.2d 24 (1954).

 In sum, when an agency like the ICC formulates licensing policy, we do not believe that the Administrative Procedure Act bars it from employing the procedural format most appropriate to its task. While the APA may require adjudication for the disposition of individual license applications,[9] we are confident that it permits rulemaking for the declaration of prospective licensing criteria which will govern later licensing applications. We conclude, accordingly, that there is no repugnance between MC–85 and the Administrative Procedure Act.

## 2. The Motor Carrier Act.

 We turn next to the alleged conflicts between MC–85 and the Motor Carrier Act. Since, except in one abortive instance,[10] the Commission has never before exercised its rulemaking power to issue a prospective, general finding of public convenience and necessity, the question is a novel one.[11] Based on the text of the Motor Carrier Act and its purpose, however, we conclude that no conflict exists.

Given the general rulemaking authority conferred by Section 204(a)(6) of the Motor Carrier Act, we believe two inquiries are controlling: (1) Do other

9. Plaintiffs' analysis of the APA overlooks the fact that the Act does not require the adjudicatory procedures of Sections 554, 556, 557 and 558 in all cases of "adjudication." Section 554 applies only to "every case of adjudication required by statute to be determined on the record after opportunity for an agency hearing." It has been held that Sections 556, 557 and 558 relate back to Section 554 and are applicable only if that section applies or if the case involves rulemaking under Section 553 that is "required by statute to be made on the record after opportunity for an agency hearing." E. g., Law Motor Freight, Inc. v. CAB, 364 F.2d 139, 143–144 (1st Cir. 1966); Lincoln Transit Co. v. United States, 256 F.Supp. 990 (S.D. N.Y.1966); Allied Van Lines Co. v. United States, 303 F.Supp. 742 (C.D.Cal., 1969). We have been referred to nothing in the Motor Carrier Act which expressly requires a hearing as a prerequisite for the issuance of a certificate of public convenience and necessity. We do read Wong Yang Sung v. McGrath, 339 U.S. 33, 70 S.Ct. 445, 94 L. Ed. 616 (1950) and Riss & Co. v. United States, 341 U.S. 907, 71 S.Ct. 620, 95 L.Ed. 1345 (1950), however, to indicate that due process requires compliance with Section 554 when a carrier applies for a certificate and presents facts which, if true, entitle him to that certificate under the applicable substantive law. Nevertheless, as the cases we have cited in text suggest, neither due process nor the APA requires application of that section in a rulemaking proceeding of the kind here involved.

10. The Commission used its rulemaking power to issue a prospective finding of public convenience and necessity in Traffic at or Near U.S.-Can. Boundary Lines, 110 M.C.C. 730, 739–740 (1969). However, that proceeding was subsequently discontinued and the Commission's use of rulemaking was never put to a judicial test.

11. The examples of prior Commission rulemaking on which the Commission relies are not controlling here because they do not concern the use of rulemaking to issue a prospective finding of public convenience and necessity. See American Trucking Assn. v. United States, supra (regulating leasing practices); United States v. Allegheny-Ludlum Steel Corp., 406 U.S. 742, 92 S.Ct. 1941, 32 L.Ed.2d 453 (1972) (regulating unloaded freight cars); United States v. Florida East Coast Railway Co., 410 U.S. 224, 93 S.Ct. 810, 35 L.Ed.2d 223 (1972) (regulating per diem rates for freight car use); Regular Common Carrier Conference v. United States, 307 F.Supp. 941 (D.C.D.C.1969) (removing "truckload lot" restrictions from certain certificates; and Tidewater Express Lines, Inc. v. United States, 281 F.Supp. 995 (D.C.D.C.1969) and George A. Rehman Co. v. United States, 133 F.Supp. 668 (S.C.D.C. 1955) (establishing commercial zones). Similarly we cannot attach significant weight to the Commission's prior practice of adjudicating whether individual applications will serve the public convenience and necessity. The Commission is free to depart from its prior methods, provided, of course, that its new policies are rationally explained and conform to its governing statute.

sections of the Motor Carrier Act, directly or by implication, preclude the Commission from prospectively finding that the public convenience and necessity will be served by a defined class of traffic, and compel the Commission to make an individual determination of public convenience and necessity for each individual carrier who applies for certification; and (2) Even if the Act does not uniformly preclude all such prospective findings, does it allow a determination that all traffic in a relatively broad class of commodities, transported anywhere in the nation, will serve the public convenience and necessity?

The sections of the Act pertinent to these inquiries are Sections 206, 207(a) and 208(a). 49 U.S.C. §§ 306, 307(a) and 308(a). Section 206(a)(1) forbids all motor carriers, with certain limited exceptions, from conducting any interstate or foreign operations not authorized by a certificate of public convenience and necessity issued by the Commission. Section 206(b) requires that applications for certificates shall be made in writing and under oath. Section 207 empowers the Commission to grant such a certificate to an applicant only after it has "found" (1) that the applicant is "fit, willing and able properly to perform the service proposed" and to conform to the Commission's regulations; and (2) that the service proposed by the applicant, "to the extent to be authorized by the certificate, is or will be required by the present or future public convenience and necessity." Finally, Section 208(a) concerns the content of a certificate and provides in part:

Any certificate issued under section 306 or 307 of this title shall specify the service to be rendered and the routes over which, the fixed termini, if any, between which, and the intermediate and off-route points, if any, at which, and in case of operations not over specified routes or between

fixed termini, the territory within which, the motor carrier is authorized to operate;

MC–85, we repeat, does not itself issue a certificate of public convenience and necessity to any carrier but rather merely defines the conditions under which that certificate will be granted. Only when individual carriers demonstrate their compliance with those conditions will they receive such a certificate. Thus, the certification scheme created by MC–85 conforms to those sections of the Act which contemplate the issuance of authority only upon individual application therefor.[12]

"Phase II" of MC–85 contemplates a Commission finding under Section 206(a)(1) that the carrier is "fit, willing and able." That section, however, also requires the Commission to "find" that the service an applicant proposes is "required" by the "public convenience and necessity." The plaintiffs believe this language compels the Commission to test independently each application against the yardstick of public convenience and necessity. They would cast on the applicant the burden of proving that he satisfies this standard and forbid the Commission to ease his task by a prospective rule that specified types of service are deemed to serve the public interest.

The plaintiffs, we believe, read too much into Section 206(a)(1). The language of the Section does not prescribe when the requisite "finding" must occur. Nor does it prescribe an exclusive format for making that finding. Without such an unambiguous directive, we can see no reason why the Commission cannot make an advance classification of carriers, "find" that the public convenience and necessity warrants operations by each carrier encompassed therein, and apply that "finding" to those individual carriers who show they bear the common attributes of the class.

12. *Cf.* Logansport Broadcasting Corp. v. United States, 93 U.S.App.D.C. 342, 210 F.2d 24 (1954).

938

■ Since we conclude that the language of the Act permits a prospective finding of public convenience and necessity, we proceed to inquire whether that finding can encompass a broad range of commodities, to be transported nationwide. Contending that it cannot, the plaintiffs rely heavily on the "specificity" language of Section 208(a). MC–85, they allege, violates that Section because the Special Certificate issued pursuant to it contains only a generalized commodity description and no limitation on the geographic scope of service. Section 208(a), however, says nothing about the type or range of commodities whose movement a certificate can authorize. It merely requires a certificate to "specify the service to be rendered." The Commission has traditionally been accorded wide latitude in using its expert judgment to "tailor commodity classifications to fit existing and reasonably foreseeable needs and conveniences."[13] By stating that certificated carriers are authorized to transport "waste products," we conclude that the Special Certificate which is issued under MC–85 makes the required specification.[14]

■ Similarly, Section 208(a) contains no restriction on the maximum geographic area within which certificated operations can occur. If "operations are not over specified routes or between fixed termini," the certificate need only specify the "territory within which, the motor carrier is authorized to operate." Surely the word "territory" is sufficiently elastic to encompass a state, a region or even the entire nation if the Commission concludes that service over so broad an area will serve the public convenience and necessity.[15] The Commission is charged with the responsibility of administering the Act in accordance with a National Transportation Policy the objective of which is the "developing, coordinating and preserving a national transportation system . . . adequate to meet the needs of the commerce of the United States, of the Postal Service, and of the national defense."[16] We believe that Section 208(a) is broad enough to permit the Commission to issue operating authority on a nationwide basis if it determines that its responsibilities under the Act make that necessary or advisable. Accordingly, we find nothing in the text of the Act which prohibits the Commission from authorizing transportation of a broad class of commodities anywhere in the nation.

Despite MC–85's literal conformity with the language of the Act, we must still ascertain whether, as the plaintiffs argue, it cannot be reconciled with the Act's underlying philosophy and purpose.

■ The economic conditions which motivated the passage of the Motor Carrier Act have been summarized by the Supreme Court in *American Trucking Association, supra*:

(T)he industry was unstable economically, dominated by ease of competitive entry and a fluid rate picture. And as a result, it became overcrowded with small economic units which proved unable to satisfy even the most minimal standards of safety or financial responsibility. So Congress felt

13. A B & C Motor Transportation Co. v. United States, 151 F.Supp. 367, 371 (D. Mass.1956); United States v. Carolina Freight Carriers Corp., 315 U.S. 475, 489, 62 S.Ct. 722, 86 L.Ed. 971 (1942).

14. We read the Special Certificate as incorporating the definition of "waste products" set forth in the Commission's Report. While we believe it would be better practice to include the complete commodity description in the Certificate, we are unwilling to hold that Section 208(a) forecloses incorporation by reference.

15. *Accord*, Alton R. R. Co. v. United States, 315 U.S. 15, 20, 62 S.Ct. 432, 86 L.Ed. 586 (1942); United States v. Carolina Freight Carriers Corp., 315 U.S. 475, 62 S.Ct. 722, 86 L.Ed. 971 (1942) (indicating that the word "territory" in Section 208(a) makes it "plain . . . that operations need not be restricted to specified routes or between fixed termini" and gives this section sufficient breadth to include statewide authority.)

16. 49 U.S.C. § 301, Historical Note.

compelled to require authorization for all interstate operations to preserve the motor transportation system from over-competition, while at the same time protecting existing routes through the "grandfather" clause.

344 U.S. at 312–313, 73 S.Ct. at 316. Equally clear are the principles of the regulatory scheme which Congress designed to curb these evils. Those principles are embodied in the universally recognized test for public convenience and necessity which the Commission first adopted in Pan American Bus Lines Operation, 1 M.C.C. 190 (1936), and which t purported to apply in MC–85:

> The questions we now must resolve are whether the proposed operations will serve a useful public purpose, responsive to a public demand or need; whether this purpose can and will be served as well by existing carriers; and whether the new services can be instituted without endangering or impairing the operations of existing carriers contrary to the public interest and the national transportation policy.
>
> Pan American Bus Lines Operation, 1 M.C.C. 190 (1936).

Based on the wide judicial acceptance these standards have received, we agree with the plaintiffs that Congress contemplated that the Commission would closely monitor entry into the trucking industry, prevent unhealthy competition among truckers, minimize duplicating trucking operations, and authorize only trucking service commensurate with the actual or potential public demand for motor carrier transportation. When the Commission issues a "finding" of public convenience and necessity, we believe, as do the plaintiffs, that the Commission must satisfy itself that these objectives will be furthered. We also agree with the plaintiffs that the Commission cannot insure compliance with these objectives without relevant data and careful economic analysis.

However, we cannot accept the proposition that only a carrier-by-carrier adjudication of public convenience and necessity can guarantee that the Commission conducts the required analysis. We see no inherent conflict between responsible motor carrier regulation and general criteria which seek to gauge in advance the types of carrier service which the public interest demands. The plaintiffs, we believe, could not seriously question the efficacy of a prospective finding of public convenience and necessity for a single commodity, to be transported within a limited geographic area. Rather, their position seems to be that the Commission cannot possibly insure compliance with the three *Pan American* indicia for the public interest when it authorizes the transportation by an unnumbered class of newcomers of a broad class of commodities anywhere in the nation. When the Commission addresses public convenience and necessity on so sweeping a scale, the plaintiffs argue, it necessarily sacrifices its ability to control economic conditions within that sector of the carrier industry. This, we take it, is what the plaintiffs mean when they describe MC–85 as a "de-regulation" of waste commodities; in essence, they contend that the effort to apply the *Pan American* criteria to the nationwide movement of waste products amounts to no regulation at all, and thus has the practical effect of an exemption from the coverage of the Act.

We appreciate the dangers which the plaintiffs discern in proceedings on the scale of MC–85. Nationwide rulemaking, we concede, may often be a less sensitive tool than individual adjudication for measuring the adverse conditions that Congress feared in the motor-carrier industry. A nationwide finding of public convenience and necessity, applicable to a broad commodity class, we admit, may lessen protection against abuses like ruinous competition or duplicating carrier operations. We refuse to say, however, that meaningful protection, in full accord with the *Pan American* guidelines, is never possible when the Commission makes such a finding. Such a *per se* rule would needlessly impair the Commission's ability to func-

tion. The Commission must respond to a broad and unforeseeable range of transportation problems. For this task, it requires considerable flexibility. As the Commission itself believes, the practice of adjudicating public convenience and necessity each time a carrier applies for certification is frequently time consuming and costly; often it may discourage new carriers from entering transportation markets where a clear demand for additional service exists. On those occasions when the need for new carrier operations is great and the danger of economic instability within the industry is small, the Commission should be free to lower the procedural barriers which selected classes of carriers must surmount. The prospective finding of public convenience and necessity is a creative device for attaining that goal. Without some evidence that the text or legislative history of the Motor Carrier Act forbids it, we decline to deprive the Commission of the many advantages it can offer.

In summary, the Commission has determined that the needs of the nation's commerce required it to streamline its certification procedures in a particular transportation sector. It sought to accomplish this goal by undertaking an assessment of public convenience and necessity on a nationwide basis in advance of individual applications. The Commission's Notice and Report attest to its conviction both that the *Pan American* criteria could be applied in this context and that the public interest would not be served by awaiting a case-by-case application of those criteria in individual licensing proceedings. We hold that neither the APA nor the Motor Carrier Act foreclosed the choice the Commission has made. While we hereafter hold that the Commission did not adequately perform the task which it undertook, we cannot say that its selection of procedure in MC–85 was an abuse of discretion.[17] Accordingly, we fault neither the Commission's nationwide approach to the issue of public convenience and necessity nor its use of a rulemaking format to resolve that issue.

### B. *MC–85 And The Rational Basis Test.*

We accept the Commission's contention that the appropriate standard of judicial review here is that articulated in United States v. Allegheny-Ludlum Steel, 406 U.S. 742, 749, 92 S.Ct. 1941, 1946, 32 L.Ed.2d 453 (1972):

> . . . We do not weigh the evidence introduced before the Commission, we do not inquire into the wisdom of the regulations that the Commission promulgates, and we inquire into the soundness of the reasoning by which the Commission reaches its conclusions only to ascertain that the latter are rationally supported. . . .

In the terminology of the APA, this means to us that the rulemaking proceeding before us is not to be examined to determine whether there is "substantial evidence" in the submissions to support the Commission's "findings and conclusions." Rather our task is solely to determine whether those findings and conclusions and the resulting "agency action" are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706.

In a matter of this kind, the Commission is not limited to the information of those parties choosing to respond with submissions. An agency acting in a rulemaking capacity is permitted to look beyond the record before it in marshalling support for its decision. This flexibility is essential for the formulation of general regulatory policy; the rationales which motivate that policy often cannot be reduced to identifiable items of evidence but depend on economic theory, prior regulatory experience and the agency's own conception of the welfare of the industry it must oversee.

At the same time, an agency may not rule by fiat, invoking only an

17. *Cf.* Regular Common Carrier Conference v. United States, 307 F.Supp. 941, 943 (D.C.D.C. 1969).

unexplained application of its expertise in defense of the policy choices it has made. Even though we do not employ the substantial evidence test to review those choices, the Supreme Court has directed that we still must engage in a "substantial inquiry." To determine whether agency action is arbitrary or capricious, we "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed. 136 (1971). And to insure that we can perform that task effectively, an agency must state the facts as it sees them, analyze those facts in accordance and with the legally relevant criteria and reason to its conclusion. In short, the "agency must in its decision 'explicate fully its course of inquiry, its analysis and its reasoning' . . ." Appalachian Power Co. v. EPA, 477 F. 2d 495, 507 (4th Cir. 1973).

■ We turn from these general principles to the case at hand. Both the plaintiffs and the Commission agree that MC–85 must be tested against the three Pan American criteria for public convenience and necessity:

. . . The questions we must now resolve are whether the proposed operations will serve a useful public purpose, responsive to a public demand or need; whether this purpose can and will be served as well by existing carriers; and whether the new services can be instituted without endangering or impairing the operations of existing carriers contrary to the public interest and the national transportation policy. . . .

The plaintiffs, however, contend that the Commission has merely paid lip-service to these guidelines and has nowhere rationally demonstrated that they have been satisfied.

In assessing the sufficiency of the Commission's analysis of these subjects, we cannot be indifferent to the context in which the Commission was acting.[18] We note, first of all, the scope and magnitude of the motor carriage potentially authorized by MC–85. MC–85 contemplates a grant of nationwide authority to an indeterminable number of carriers. The traffic affected by it may prove to be substantial, and, accordingly, its impact on the transportation industry may prove to be of major consequence. Second, one must acknowledge the innovative character of MC–85. Never before has the Commission analyzed transportation demand, the adequacy of existing service and the economic impact of new authority on so broad a geographic scale. Moreover, it was attempting to make these assessments for a newly established commodity description which it fashioned for the purpose of this proceeding. Accordingly, the Commission's past experience did not provide ready made precedent of commensurate scope. Third, the Commission was not undertaking an experimental program or issuing temporary or emergency carrier authority, although the Motor Carrier Act clearly authorizes it to do so.[19] Rather, it was embarking on a permanent licensing scheme involving authority unlimited in time. Finally, the Commission was not functioning in a realm of analysis where no empirical data was available or where that data would not be illuminating. The controlling legal criteria were not such that the Commission was forced, of necessity, to speculate without data or analysis.

In this context, we first examine the Commission's conclusion that a public demand existed for additional transportation of waste products. At the outset, we note our agreement with the plaintiffs that the submissions received by the Commission supply few specific examples of shippers who cannot secure

18. ABC Air Freight, Inc. v. CAB, 391 F.2d 295 (2nd Cir. 1968).

19. See § 210(a) of the Motor Carrier Act, 49 U.S.C. § 310(a).

942

transportation for waste products.[20] In accordance with the Motor Carrier Act, however, the Commission was looking to future as well as present demand. What it thought it perceived was a transportation demand which was currently growing and which would expand manyfold in the near future.

In both its Notice of Proposed Rulemaking and in its Report, the Commission examined in detail the litter problem, the ability of recycling to aid in solving that problem as well as contribute to the conservation of resources, the research currently occurring to expand recycling capability, and the scope of existing and proposed recycling programs and facilities. The Commission extrapolated these existing circumstances and found that the recycling of wastes would continue to grow at a substantial pace. It then put this finding together with its undisputable observation that "transportation . . . represents a vital and necessary component of any effective recycling program" and concluded that additional transportation of waste products would be "responsive to a public demand or need." One can quarrel, as do the plaintiffs, with the Commission's judgment that the recycling industry is fledgling in comparison with the size to which it will shortly grow. We cannot say, however, that the Commission failed to meaningfully address itself to the issue of public demand for the transportation involved or that there is no rational connection between the facts upon which it relied and the conclusion which it reached.

The Commission's treatment of the other two *Pan American* criteria is more cursory and, accordingly, more troublesome. Only a few scattered portions of the 35 page Notice and Report address themselves to the questions of whether the public demand perceived would be served as well by existing certified carriers and whether new authorizations would injure existing carriers. Since the Commission addressed itself separately to the circumstances of existing motor and rail carriers, we shall do likewise. We quote below in context each of the Commission's observations relevant to the circumstances of existing motor carriers.

In its Notice, the Commission concluded its analysis of the growing recycling field with the following comment:

Local community collection centers are being established throughout the country [for reclamation of waste paper]. Similar programs are being instituted in other industries facing these same problems. Transportation of the used glass containers and other materials of potential litter, such as aluminum cans, from local centers to the permanent reclamation and recycling centers is needed. Such traffic, which is largely new traffic and not presently being moved by for-hire motor carriers, initially would be erratic, but should increase as the reclamation programs progress. . . .

This view that the demand perceived would consist "largely [of] new traffic" is reiterated in the Report.

The discussion in the Commission's Report begins with an examination of "the growing volume of wastes that must be disposed of each year in this country" and of its statutory authority for the MC–85 proceeding. After reciting the *Pan American* criteria it states:

From our prior discussions in this report and in our notice of proposed rulemaking . . . it is clear that the proposed operations will serve a useful public purpose . . . and that existing carriers cannot serve this purpose in view of the fact that much of this recycling traffic will be new traffic not now handled by such carriers.

20. While the record contains a few assertions of specific unsatisfied transportation demands, the vast majority of submissions favoring the MC–85 approach may fairly be characterized as letters of commendation to the Commission for its environmental concern.

After discussing the contentions of the protesting railroads, the Commission set forth its definitions of a "waste product" and a "recognized pollution control program." In the course of explaining these definitions, the Commission stated:

. . . We believe the commodity description to be clear and unambiguous and readily enforceable. It is broad enough to contribute significantly to the fight against pollution; yet it is sufficiently restrictive to prevent any substantial diversion of traffic or revenues from existing carriers. Any diversion that will occur by a grant of authority in this proceeding would certainly be offset by the benefits derived by the industries which would reduce their consumption of raw materials, and by the public which seeks a cleaner and healthier environment.

A number of parties have suggested that certain commodities be excepted from the commodity description. In view of our discussion above relating to the definition of the commodity description and the insubstantial amount of diversion expected by our grants of authority herein, no specific exceptions will be imposed. It should be noted in this respect that this is a rulemaking procedure and that if any carrier or group of carriers proves to be adversely affected by our findings in this report, and they can present sufficient evidence of such an adverse effect, the adopted regulations can then be amended. The evidence presently before us, however, does not indicate that such an occasion will arise. The involved traffic appears to consist of low-value commodities which will not be attractive to many certificated carriers. . . .

Finally, in its Summary, the Commission observed:

. . . Although certain carriers and carrier organizations believe that their interests may be adversely affected to some extent, failure to become part of the "team" fighting to halt pollution may seriously affect the future of not only the trucking industry, but all American industry. The interests of existing carriers have been sufficiently protected in this report. Any adverse effect will be minimal to these carriers, especially when compared to the adverse effect on the environment if we fail to adopt the proposed regulations. We earnestly hope all motor carriers will desire to join the national effort to save and restore our American environment.

Despite the brevity of this analysis one can say that the Commission considered the possibility of diversion of current motor carriage from existing carriers and concluded that it would be "insubstantial." Crucial to this conclusion was the Commission's finding that the definition of a "waste product" narrowed the proposed service to a field from which existing carriers do not currently derive substantial traffic or revenue. This is not a self-evident proposition,[21] however. Nowhere in the Notice or Report are we given any indication of what led the Commission to so find.

The Commission's analysis of the second *Pan American* criterion is more perfunctory. It did not find that there were no motor carriers currently authorized to transport waste products as defined in the Report. Indeed, the submissions suggest the contrary and, the Commission seems implicitly to acknowledge that there are such carriers.[22] Rather, the Commission seems to have concluded that currently certified carriers could not or would not serve the perceived need as well. So far as we are able to determine, however, only two

21. The three dissenting commissioners each conclude, on the basis of what appears to be supporting data, that existing carriers are now deeply involved in the transportation of waste products and that substantial diversion may well occur.

22. A number of motor carrier submissions indicate that carriers are currently autho-

sentences in the Notice and Report have any bearing whatever on this issue. First, the Commission states that "existing carriers, cannot serve this purpose in view of the fact that much of this recycling traffic will be new traffic not now handled by such carriers." This is, at best, a *non sequitur*. The remaining, arguably relevant, observation is contained in an analysis of possible diversion: "The involved traffic appears to consist of low value commodities which will not be attractive to many certified carriers." No analysis is attempted, even in general terms, of the carriers currently certified to transport "waste products" or of the equipment and facilities they might be willing to devote to such carriage.

The Commission's analysis of the second and third *Pan American* criteria in the context of rail carriage is more fully developed. The Commission implicitly acknowledges that significant quantities of waste products currently move by rail and that the railroads derive substantial revenue from this movement. The figures cited in the two dissents bear marked witness to this fact. The Commission found, however, that many reclamation and recycling centers "are located in areas which cannot be or are not reached by rail" and that many of the "established" facilities would require "motor carrier service . . . both prior and subsequent to the movement by rail." On the basis of these findings and those related to what the Commission perceived to be the dynamic nature of the recycling field, it concluded that "a sufficient showing [had] . . . been made that existing rail service is inadequate to meet the complete transportation requirements expressed on this record" and that the proposed motor

carrier service offered 'inherent' advantages to the shippers involved." Finally, the Commission added:

In addition, it does not appear to be economically feasible for motor carriers to compete with the railroads for long-haul movements of the involved traffic. Due to the relatively low value of the waste commodities in issue, eligible motor carriers can be expected to limit the territorial scope of their operations and transport the involved commodities only on comparatively short-distance movements. We thus do not believe that our grants of authority herein will have a significant impact on the present operations of the railroads. . . .

While this analysis examines the demand for additional service, inability of rail carriage to meet this demand as well as motor carriage, and the potential injury to the railroads under MC–85, it is flawed by the fact that its conclusion, to be rationally supported, requires an additional finding which was not made by the Commission and which appears to be inconsistent with the only relevant data referred to in the Notice and Report. The Commission does not find that the railroads currently derive insubstantial traffic or revenue from the short haul movement of "waste products." Dissenting Commissioner Murphy and Vice Chairman Hardin comment on this point and provide the only relevant data at pages 116 and 117 of the Report:

. . . The implication in the majority's decision that the railroads transport waste products over long distances and thus will not be affected by the grant of the special certificate is wholly unfounded. The railroads

rized to transport "waste products." National Tank Truck Carriers and Chemical Leaman requested an oral hearing for the purpose of adducing the authorities of existing motor carriers of bulk commodities and demonstrating the abilities of these motor carriers to handle waste products transported in bulk. We cannot fault the Commission

for concluding that there was no reason this information could not have been provided in the submissions. We do not believe, however, that sparsity of data in the submissions in a rule-making proceeding provides any excuse for an otherwise unsatisfactory agency analysis of a relevant statutory criterion.

participate to a considerable extent in the transportation of waste products over relatively short, as well as over longer, distances. For example, the following table emphasizes the transportation characteristics of certain waste products moving by rail within the several major regions.

[Table deleted]

While it is clear from the above Table 2 that waste products in many instances move over relatively short distances by rail and thus would be susceptible to diversions by carriers authorized under the special certificate to transport these commodities, the majority fails to adequately examine the effect of the grant of the special certificate on the operations of the railroads.

We, of course, do not presume to suggest where the truth of the matter lies. It may well be that the Commissioners joining the majority have examined other contradictory or more persuasive data and have concluded that short haul rail movement is insubstantial. But, once again, the record yields no affirmative assurance that the point has been examined and rationally decided by the Commission majority.

The relevant inquiry for this Court is whether, considering the relevant legal criteria and the scope of the task undertaken by the Commission, the analysis contained in its Notice and Report affirmatively demonstrates that MC–85 represents a rational exercise of Commission authority. We conclude that it does not. Lacking is some rational explication of the Commission's findings with respect to diversion and current supply which would dispel the concern that the Commission, in its commendable zeal to rescue the environment, may have failed to take a hard look at the problems which Congress intended that it evaluate before issuing permanent authority.

We cannot say with assurance from the current record that the Commission has not conducted the required analysis. For that reason we do not dictate the form or character of any subsequent proceedings before the Commission. We say only that the Notice and Report do not provide us with the assurance we think required by law. Whether the appropriate remedy is by way of further explanation of that which the Commission has already done or by way of additional investigation, submissions or hearing we leave to the Commission.

We do not wish to be understood as holding that the Commission is not entitled to broad latitude in formulating its commodity descriptions or in estimating things like diversion and existing supply. Moreover, we recognize that the Commission is not required to quantify forecasts which as a practical matter are either not quantifiable or quantifiable only with years of study.[23] The Commission may clearly exercise and rely upon its background knowledge and expertise in making forecasts. We cannot, however, assume that undescribed and explained administrative expertise would fill the gaps in the Commission's analysis if the Notice and Report were more helpful on the reasons for its conclusions.

In short, we find ourselves of the same view as that of Judge Friendly in ABC Air Freight Company v. CAB, 391 F.2d 295, 307 (2nd Cir. 1968):

. . . We fully recognize that, as Judge Prettyman classically stated in American Airlines, Inc. v. CAB, 192 F.2d 417, 422 (D.C.Cir. 1951), agencies are not required to forecast the future "with mathematical precision." But the very bite of his fine opinion is that in granting new authorizations, an expert agency must look forward and make the best informed estimate that it can. We find it disappointing that, on an issue of such importance to the instant determination, that function was not more fully performed.

23. See WBEN v. United States, 396 F.2d 601 (2nd Cir. 1968).

We would not wish to be misunderstood as ruling that even the present record might not be sufficient for the Board to initiate a properly controlled experiment in the authorization of truckers as air freight forwarders, with the limitation on numbers and the reporting and other requirements an experiment would be expected to entail. But that is not at all what the Board did. Reading the opinion as a commitment to grant authorizations to all comers, we find it wanting in the careful investigation, the substantial evidence and the rational explication that are demanded before an expert agency may lawfully embark on a new course apparently so fraught with danger to the industry Congress has confided to its regulation. . . .[24]

▪ Finally, at the risk of stating the obvious, we do not hold that existing carriers are entitled to a monopoly on as much as they can and are willing to handle. The second and third *Pan American* criteria are but two of three and the Commission is clearly entitled to weigh one against the other. We do hold, however, that the Commission, even in a rulemaking proceeding, must provide some assurance that it has rationally engaged in an analysis of each of the relevant criteria. This the Commission has not done.

C. *The Adequacy Of Plaintiffs' Opportunity To Be Heard.*

▪ The plaintiffs also claim that even if the Commission is sustained in its rulemaking approach, it nevertheless erred in its refusal to permit oral hearing on the merits of MC–85 and in its unwillingness to receive statements in reply to the submissions favoring MC–85. We do not believe these procedural measures were required during the Commission's original consideration of MC–85. Nor are we prepared to require their utilization on remand.

In our treatment of these issues, we are guided by our earlier holding that the Commission has validly employed its rulemaking authority to promulgate MC–85. Under Section 553(a) of the APA, the Commission is required only to "give interested persons an opportunity to participate in the rulemaking through submission of written data, views or arguments with or without opportunity for oral presentation."

▪ Clearly, under Section 553(a), the Commission possesses the discretion whether to permit oral presentation and reply submissions and, if so, to determine their scope, character and time-sequence. Presumably an agency's decisions on these matters are reviewable for an abuse of discretion.[25] However, we find no such abuse of discretion here. We cannot say that the opportunity afforded the plaintiffs to submit data and statements of position to the Commission was inadequate. Likewise, we cannot say that the nature of the issues MC–85 presented to the Commission made oral hearing and reply submissions essential devices for rational Commission decision-making.

D. *The Validity Of MC–85 Under Nepa.*

The railroad plaintiffs fault MC–85 for one final shortcoming. They allege that the Commission has failed to comply with the National Environmental Policy Act ("NEPA") by preparing an

24. We realize that Judge Friendly's analysis in this case has been criticized as improperly importing the APA concept of "substantial evidence" into the area of judicial review of rulemaking. Davis, Administrative Law § 7.02, pp. 318–319 (1970 Supp.). We do not read his analysis, however, as using the phrase in this sense. What Judge Friendly was looking for and could not find was some assurance that the agency had given attention to its task commensurate with the character of the issue to be resolved and with the impact of its action.

25. Clagett, Informal Action—Adjudication—Rulemaking: Some Recent Developments in Federal Administrative Law, 1971 Duke L.J. 51, 73; *Cf.* Walter Holm & Co. v. Hardin, 145 U.S.App.D.C. 347, 449 F.2d 1009 (1971).

environmental impact statement. On the premise that MC–85 may add appreciably to the existing volume of motor-carrier traffic, they warn that it will contribute to air pollution, highway congestion and the depletion of the national fuel supply. Accordingly, the railroads assert that an impact statement was essential to insure that the adverse environmental effects of MC–85 were fully analyzed and disclosed before the Commission took affirmative action. Since our prior holdings leave the way open for additional Commission proceedings in MC–85, we believe it incumbent on us to pass upon this contention and to provide appropriate guidance for future Commission action.

The statutory duties that the plaintiffs invoke are contained in Section 102 of NEPA, 42 U.S.C. § 4332. Section 102(2)(C) sets forth the requirement of an environmental impact statement. It directs that all "major Federal actions significantly affecting the quality of the human environment" must be accompanied by a "detailed statement" addressing the following five subjects:

(i) The environmental impact of the proposed action,

(ii) Any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) Alternatives to the proposed action,

(iv) The relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) Any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

■ The Commission offers two arguments why we should not hold that its action in MC–85 was violative of these strictures. At the outset, it submits that private corporations like the plaintiffs, who sue primarily to protect their pecuniary interests, have no standing to enforce the Commission's obligations under NEPA. An identical assertion was rejected by the Tenth Circuit in National Helium Corporation v. Morton, 455 F.2d 650 (1971). The court employed reasoning that is both apposite and persuasive here:

It cannot be denied that the (plaintiff) companies have a genuine substantial financial interest in the termination of the (challenged) contract. But it is their asserted representation of the public interest—which from their personal standpoint is admittedly less important than their private financial stake—which in final analysis justifies their seeking judicial review. . . . True, the plaintiffs are not primarily devoted to ecological improvement, but they are not on this account disqualified from seeking to advance such an interest. No group has a monopoly on working for the public good.

455 F.2d 654–55.

■ The Commission's second argument requires more elaborate treatment. The Commission does not contend that MC–85 is not a major federal action significantly affecting the quality of the human environment. Rather it asserts that its Notice and Report "constitute environmental impact statements within the spirit, if not the letter, of NEPA."

The argument in support of this conclusion is set forth by Commission counsel in the following fashion:

In describing the positions taken by the various parties to the proceeding, the Commission expressly took note of the railroads' "claim that a grant of authority will put more trucks on the road to pollute the air and clog the highways." (144 M.C.C. at 99). But, as the Commission reasonably pointed out, "due to the relatively low value of the waste commodities in issue, eligible motor carriers can be expected to limit the territorial scope of their operations and transport the involved commodities only on comparatively short-distance movement" (114 M.C.C. at 106). Indeed, the most common use of the Special Certificate is likely to be by carriers seeking "to alleviate their backhaul problems" (114 M.C.C.

at 109)—*i. e.*, the problem of vehicles which are now returning empty to their origin because the lack of a return load. The Commission reasonably concluded that, on balance, any adverse effects resulting from the new Special Certificate, in terms of added truck traffic, is more than offset by the "benefits derived by the industries which would reduce their consumption of raw materials, and by the public which seeks a cleaner and healthier environment" (114 M.C.C. at 108). Thus the claimed adverse effects of added truck traffic plainly were condemned by the Commission, which concluded that they were outweighed by the benefits to be derived from the proposed rules.

This discussion is accurately characterized by the plaintiffs as a "post fact rationalization of counsel." · It is unsatisfactory in two respects. First, it does not accurately describe the Commission's reasoning as reflected in its Report. Second, we do not believe the few scattered comments referred to in that Report evidence the kind of agency focus on environmental issues which Section 102(2)(C) was designed to assure.

The Commission in its Report does not conclude that "the most common use" of MC–85 would be to alleviate backhaul problems. Nor does the Report demonstrate that the Commission weighed any adverse environmental effects of MC–85 against the benefits to be derived by conservation of raw materials or reduction of litter.[26] While the Commission did articulate a finding that the new carriage under MC–85 would be unlikely to divert long haul carriage from the railroads, we find this observation an inadequate substitute, both in

scope[27] and depth, for the environmental analysis required by NEPA.

 While we do not say that there is any single expositional format for compliance with Section 102(2)(C) of NEPA, we think that the Commission's approach seriously underestimates the nature of the analysis which that section, and the Act generally, contemplate. The purpose of an environmental impact statement is to provide affirmative assurance to the public and to a reviewing court that the agency has taken a careful and detailed look at the environmental consequences of its action. Section 102(2)(C)'s list of five subjects for administrative scrutiny attests to the care and individualized focus which must characterize an agency's analysis. The agency must expressly divulge the unavoidable adverse effects of its action. And it must compare the merits of that action with the other options open to it. These discussions must also examine "any irreversible and irretrievable commitments of resources" for which the agency's action may be responsible as well as "the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity."[28]

 The many court decisions interpreting Section 102(2)(C) have stressed that an adequate impact statement must be comprehensive and must present fully the facts and reasoning which have shaped the agency's environmental policies. A recent decision of the Eighth Circuit Court of Appeals has summarized a number of the opinions in this evolving area:

Nothing less than a complete impact statement can serve the important purposes of § 102(C)(iii) of NEPA.

---

26. The quote from page 108 of the Report, in context, reflects a comparison of environmental benefits with injury to existing carriers.

27. Diversion of long haul rail traffic to motor carriers would appear to be a relevant environmental consideration. Wholly aside from the sufficiency of the Commission's analysis of this issue, however, it is not clear to us that this is the only area in

which there may be adverse environmental impact. In any event the Commission has not indicated that it has considered other aspects of the matter and found no such impact.

28. We are not qualified to say whether either or both of the final two criteria have relevance in the context of MC–85. If they do not, the Commission should so advise.

As the District of Columbia Circuit Court stated in Natural Resources Defense Council, Inc. v. Morton [148 U.S.App.D.C. 5] 458 F.2d 827, 834 (1972), "it is the essence and thrust of NEPA that the pertinent Statement serve to gather in one place a discussion of the relative environmental impact of alternatives." . . . A statement which includes a detailed discussion of all reasonable alternatives to a proposed project and their effects, see, Natural Resources Defense Council, Inc. v. Morton, supra at 834, insures that agency officials will be acquainted with the tradeoffs which will have to be made if any particular line of action is chosen. A complete impact study is an integral part of the "careful and informed decision-making process." See, Calvert Cliffs Coord. Com. v. United States A. E. Com'n., 146 U.S.App.D.C. 33, 449 F.2d 1109, 1115 (1971).

The complete impact statement must contain more than a catalog of environmental facts, however. The agency must also "explicate fully its course of inquiry, its analysis and its reasoning." Ely v. Velde, 451 F.2d 1130, 1139 (4th Cir. 1971). Thus, the complete formal impact statement represents an *accessible* means for opening up the agency decision-making process and subjecting it to critical evaluation by those outside the agency, including the public.

Environmental Defense Fund, Inc. v. Froehlke, 473 F.2d 346, 350–351 (8th Cir. 1972)

The Commission's Notice and Report do not meet this standard. The most that can be said is that the Commission's Report acknowledges the railroad's claim that MC–85 will have some adverse environmental impact. Never does the Commission even indicate whether and to what extent it believes the claim has merit. We recognize that, in MC–85, the Commission sought to alleviate an environmental problem of major magnitude and, to that end, it decided to authorize extensive new motor carrier operations. Those operations, how-

ever, may well possess environmental drawbacks of their own. Perhaps these drawbacks pale by comparison to the environmental consequences of Commission inaction or of other alternatives. Whether they do or not, we fault the Commission for its silence on the subject. Whenever applicable, Section 102 requires an agency to set forth the pros and cons of its action, weigh possible alternatives, and lay bare its environmental reasoning for public scrutiny. We hold that the Commission's notice and report in MC–85 do not discharge this obligation.

IV. PHASE II.

We turn, finally, to the plaintiffs' attack on "Phase II" of MC–85: the Commission's mechanism for approving individual applications for operating authority under the MC–85 Special Certificate. The plaintiffs submit that the Commission has disregarded its procedural duties under the Motor Carrier Act by depriving presently certified carriers of notice of and an opportunity to contest those applications for authority before they are granted.

While resisting these claims on their merits, the Commission, at the outset, asserts that the plaintiffs are in no position to secure their adjudication by this Court. First, the Commission argues that the plaintiffs never opposed the procedures they now challenge while MC–85 was being deliberated by the Commission and hence have "waived" their right to contest them here. Second, the Commission insists that the claims which the plaintiffs press derive not from MC–85 itself but from the abortive Lemmon proceeding; since the Commission's certification of Lemmon has been revoked it asserts that proceeding is now moot and we are precluded from considering the plaintiffs' contentions. We believe that neither argument is meritorious, that the record is sufficient to permit judicial resolution of this matter, and that it should be decided without further delay.

As they must, the plaintiffs candidly concede that they did not challenge the

adequacy of the Commission's "Phase II" procedures while MC–85 was first before the Commission. They maintain, however, that they did not speak up because the defects they allege in those procedures were not foreseeable while MC–85 was under consideration by the Commission. They say that the text of MC–85 supplies, at best, an ambiguous indication of the procedures with which the Commission intended to assess applications for MC–85 authority;[29] that they reasonably assumed that the Commission would follow its usual practice, codified in the Code of Federal Regulations, of affording them notice of, and an opportunity to intervene in, certification proceedings;[30] and therefore that, understandably and excusably, they overlooked the potential inadequacy of the Commission's mechanism for implementing MC–85's Special Certificate until, in Lemmon and other cases, the Commission began the actual process of granting certification. Finally, the plaintiffs observe that they could not have presented their objections in the Lemmon proceeding because they learned of the Lemmon application only after it had been granted.

Under these circumstances, we do not believe that the plaintiffs' silence before the Commission operates as a "waiver" of their right to assert their claims in this Court.[31]

■ On the issue of mootness, we believe it decisive that the Commission has disavowed only the result it reached in Lemmon, not the procedures it employed, and concedes that those procedures comprise an established and continuing method for the disposition of individual applications under MC–85. Under these circumstances, we cannot say that the matter is moot.[32]

Under Section 205(e) of the Motor Carrier Act, 49 U.S.C. § 305(e), "interested parties" must receive notice and the opportunity to intervene in any proceeding commenced under the Act:

> In accordance with rules prescribed by the Commission, reasonable notice shall be afforded, in connection with any proceeding under this chapter, to interested parties . . . and opportunity for intervention in any such proceeding for the purpose of making representations to the Commission or for participating in a hearing, if a hearing is held, shall be afforded to all interested parties.

A number of courts have construed Section 205(e) in the context of a Commission proceeding to issue a new certificate of public convenience and necessity or to amend an existing certificate. In that setting, it is firmly established that the term "interested parties" embraces competitors of the petitioning carrier, and that such competitors must receive the opportunity to contest proposed expansions in service before they can lawfully commence. Georgia-Florida-Alabama Transportation Company, Inc. v. United States, 290 F.Supp. 764, 767 (N.D.Ala.1968); Murphy Motor Freight Lines v. United States, 148 F.Supp. 471, 475 (D.Minn.1957); aff'd. 355 U.S. 11, 78 S.Ct. 52, 2 L.Ed.2d 20 (1957); Wiley v. United States, 245 F.Supp. 669, 677 (E.D.Ill.1965).

The Commission argues, however, that the clear strictures of Section 205(e) do not govern applications for special authority under MC–85 because those applications present no controversy about public convenience and necessity. In essence, the Commission contends that nothing can be gained by the intervention of competing carriers in MC–85 cer-

---

**29.** The Commission's order is silent on the procedural rights of competing carriers during certification proceedings under the MC–85 Special Certificate although it specifies the procedures which applicants for certification must follow. See 114 M.C.C. 125–126.

**30.** See 49 C.F.R. § 1100.247.

**31.** See Crouse Cartage Co. v. United States, 343 F.Supp. 1133 (N.D.Iowa 1972); Cf. Hor-

mel v. Helvering, 312 U.S. 552, 556–557, 61 S.Ct. 719, 85 L.Ed. 1037 (1941); Jaffe, Judicial Control of Administrative Actions, p. 5.

**32.** See Dyer v. SEC, 266 F.2d 33, 47 (8th Cir. 1959); Avco Corp. v. Local U. # 787 of Int. U.; U.A. & A. Imp. Wkrs., 459 F.2d 968, 974 (1972).

tifications proceedings because those proceedings involve no disputable issue which competing carriers might help to resolve.

We feel the Commission seriously miscasts an MC–85 certification proceeding when it portrays it as merely ministerial in nature. While that proceeding may not decide public convenience and necessity, it must still make several other determinations which are subject to substantial factual dispute. The foremost such determination is whether the commodities sought to be transported are, in fact, "waste products" within the scope of MC–85. Not only does this inquiry present a complex factual question; it poses delicate interpretative problems as well. The second major determination the Commission must make is whether the service proposed will be conducted pursuant to a "recognized pollution control program;" the Commission's definition of this concept likewise suggests the need for careful and orderly deliberation before authority is granted. Finally, prior to certificating new service under MC–85, the Commission must investigate the fitness and responsibility of the petitioning carrier; here, too, the Commission's decision is hardly routine but, instead, calls for detailed factual inquiry.

Even though the Commission disclaims its certification of Lemmon Transport, the Commission's errors in that proceeding illustrate the dangers which exist when the Commission acts *ex parte*, without the benefit of the adverse evidence which competing carriers can bring to the Commission's attention. Those carriers have a vital interest in forestalling unlawful incursions on their operations; their participation in proceedings to certify their competitors helps to insure that the Commission

closely inspects the qualifications of applicants and that, in consequence, its licensing policies are fairly and reliably administered. Accordingly, we conclude that presently certified carriers like the plaintiffs are entitled to the notice and opportunity for intervention conferred by Section 205(e) before authority under MC–85's Special Certificate can be granted.

We do not hold—nor do the plaintiffs insist—that the Commission must afford competing carriers an oral hearing on pending applications for MC–85 authority. We do hold, however, that before such applications can be approved, the Commission must give notice to competing carriers by some reasonable means [33] and they must be granted a reasonable opportunity to submit evidence and argument opposing certification.

## V. CONCLUSION.

In summary, we uphold the Commission in its use of rulemaking to issue a prospective finding of public convenience and necessity and in its refusal to permit the plaintiffs' oral hearing and reply statements during its consideration of MC–85. However, we set aside MC–85 itself because the Commission has not shown that its finding of public convenience and necessity has a rational basis and because the Commission has not complied with NEPA. Finally, we hold that reasonable notice of individual applications for MC–85 authority must be given to competing carriers and that they must receive a reasonably opportunity to oppose those applications before they are granted.

The Interstate Commerce Commission's Order in Ex Parte No. MC–85 is set aside and remanded for further proceedings consistent with this Opinion.

33. The plaintiffs urge that Federal Register publication should be required. Since this form of notice is now regularly used to publicize regular applications for Commission certification (49 C.F.R. § 1100.247) and since the Commission neither resists the use of Federal Register notification if notice is required, not suggests any alternative form of notice, we assume that notice in this form will be given and find no occasion to further elaborate on the Section 305(e) requirement of "reasonable notice."