**O–J TRANSPORT COMPANY,**
**Petitioner,**

v.

**UNITED STATES of America and Interstate Commerce Commission, Respondents,**

**and**

**Associated Truck Lines, Inc., et al., Intervenors.**

**No. 75–1671.**

United States Court of Appeals, Sixth Circuit.

Argued Feb. 11, 1976.

Decided June 4, 1976.

Robert E. McFarland, Bloomfield Hills, Mich., for petitioner.

Joel H. Steiner, Axelrod, Goodman, Steiner & Bazelon, Chicago, Ill., Jack B. Josselson, Cincinnati, Ohio, for intervenor Courier-Newsom.

Fritz R. Kahn, Henri F. Rush, Gen. Counsel, I. C. C., Washington, D. C., Edward H. Levi, U. S. Atty. Gen., John H. D. Wigger, Dept. of Justice, Washington, D. C., for respondents.

Before PECK, MILLER * and LIVELY, Circuit Judges.

LIVELY, Circuit Judge.

This is a petition for review of a final order of the Interstate Commerce Commission (Commission) denying the application of petitioner O–J Transport Company (O–J) for a certificate of convenience and necessity under § 207(a) of the Interstate Commerce Act, 49 U.S.C. § 307(a). O–J is a small trucking company owned by two black residents of Detroit, Michigan. It has been engaged in hauling malt beverages from Milwaukee, Wisconsin to Detroit under temporary authority since September 1, 1973. Its application sought a certificate of public convenience and necessity authorizing transportation of automobile parts over irregular routes between designated points in the Detroit, Michigan area on the one hand and Chicago, Illinois and Janesville, Kenosha and Milwaukee, Wisconsin on the other, as well as the transportation of malt beverages between Milwaukee and Detroit. The Commission directed that a certificate issue for the transportation of malt beverages, but denied the application for authority to transport automobile parts. See O–J Transport Company Common Carrier Application, 120 M.C.C. 699 (1974). That portion of the order which granted the certificate for transportation of malt beverages is not before this court and our review is concerned only with the denial of O–J's application for authority to haul automobile parts.

O–J's application was supported by the "big three" automobile manufacturers, General Motors, Ford and American Motors, and was opposed by a large number of trucking companies which hold certificates that permit, inter alia, the transportation of automobile parts between the points designated in the application. The protesting carriers have transported automobile parts for one or more of the automobile manufacturers who supported the application. The administrative law judge to whom the application was referred for hearing and initial decision found that the protesting carriers could perform services for which O–J sought a certificate, but that Ford Motor Company had "expressed reservations as to the adequacy of the service it is receiving and American Motors that the proposed service is of the type it prefers using." He discounted the supporting documents of General Motors as being too indefinite to have probative value in a public convenience and necessity proceeding. Finding further that neither Ford nor American Motors intended to divert more than a small fraction of its available traffic from existing carriers if O–J's application were granted, the administrative law judge concluded (with exception of the request for service from or to Janesville, Wisconsin) that "the service proposed in this application will serve a useful public purpose, responsive to a public need without endangering or impairing the operation of existing carriers contrary to the public interest." He then made the specific finding that public convenience and necessity required the operation by O–J as a motor common carrier in the manner set forth in the application (excluding service to and from Janesville, Wisconsin) and that O–J was able properly to perform such services. The protesting carriers filed exceptions and, upon review, the Commission denied the auto parts application by a two-to-one vote, Commissioner O'Neal dissenting.

In these review proceedings O–J first contends that the Commission abused its discretion by denying O–J's application on

* The Honorable William E. Miller died on April 12, 1976 and did not participate in this opinion.

the sole basis of a finding that the existing carriers are capable of providing the service sought to be rendered in the application while ignoring other criteria, and that its findings are not supported by substantial evidence in the record. In *Interstate Commerce Commission v. J–T Transport Co., Inc.,* 368 U.S. 81, 88, 82 S.Ct. 204, 7 L.Ed.2d 147 (1961), a contract carrier case, the Supreme Court held that the Commission must consider the adequacy of existing services, but that this factor is "not determinative." This principle has also been applied in common carrier cases. *See, e. g., Warren Transport, Inc. v. United States,* 525 F.2d 148, 149 (8th Cir. 1975), quoting from *Feature Film Service, Inc. v. United States,* 349 F.Supp. 191, 201 (S.D.Ind.1972), as follows:

> The adequacy or inadequacy of existing service is a basic ingredient in the determination of public convenience and necessity, but it is not and may not be used as the sole test in determining whether public convenience and necessity exist. . . . Successful past operations of the applicant, along with other factors, are also entitled to consideration in determining public need.

■ A careful reading of the Report of the Commission does not lead to the conclusion that the majority relied solely on the finding that existing service is adequate in denying O–J's application. The Commission pointed out that the applicant has the burden of establishing that its proposed operation is or will be required by present or future public convenience and necessity and then paraphrased often-quoted Commission language from *Pan-American Bus Lines Operation,* 1 M.C.C. 190, 203 (1936), as follows:

> In considering to what extent this statutory requirement has been met, we must determine whether the new operation will serve a useful purpose, responsive to a public demand or need; whether this purpose can or will be served as well by existing carriers; and whether it can be served by applicant with the new operation or service proposed without endangering or impairing the operations of ex-

isting carriers contrary to the public interest. 120 M.C.C. at 702.

In addition to adequacy of existing service and facilities the Commission considered the very general nature of the statements of the supporting shippers intended to establish public convenience and necessity and the evidence of the protesting carriers "of an imbalance of traffic terminating in the Detroit area and . . . a need for additional traffic outbound from Detroit to balance their operations."

In *Interstate Commerce Commission v. Parker,* 326 U.S. 60, 65, 65 S.Ct. 1490, 89 L.Ed. 2051 (1945), the Supreme Court pointed out that the role of the Commission is to find the facts and make determinations of whether public convenience and necessity require additional motor carrier service in a particular situation where an application has been made. In exercising this discretionary function the Commission may rely on a wide variety of circumstances which its expertise indicates are relevant to a particular determination. In reviewing a determination by the Commission of the existence or non-existence of public convenience and necessity in a given case the courts must examine the Commission's evaluation of the record to determine that the Commission has exercised its discretion "in conformity with the declared policies of the Congress" as set forth in the statement of National Transportation Policy, 49 U.S.C. preceding § 1. *Shaffer Transportation Co. v. United States,* 355 U.S. 83, 87–88, 78 S.Ct. 173, 2 L.Ed.2d 117 (1957). We believe the Commission's holding in this case was based on substantial evidence related to factors required to be considered under existing transportation policies.

■ Though the Commission's finding that public convenience and necessity do not require the granting of O–J's application is supported by substantial evidence, this does not end the court's inquiry. As the Supreme Court stated in *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.,* 419 U.S. 281, 284, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974), it is possi-

ble for a finding to be supported by substantial evidence and yet reflect arbitrary and capricious action. There the Court pointed out that the Administrative Procedure Act (APA) in 5 U.S.C. § 706 provides six separate standards of review. These standards are stated in the disjunctive and an agency's action, findings and conclusions may satisfy one of these criteria and not another. However, when the substantial evidence test has been met the scope of review is quite narrow and the court must avoid substituting its judgment for that of the Commission. The APA does not require an agency to furnish detailed reasons for its decision so long as its conclusions and underlying reasons may be discerned with confidence. *Lemmon Transport Co., Inc. v. United States,* 393 F.Supp. 838, 841 (W.D. Va.1975). Stated another way, the Commission's decision must be sufficiently clear so that a court is not required to speculate as to its basis. *Ross Express, Inc. v. United States,* 529 F.2d 679, 682 (1st Cir. 1976).

■ In *Bowman, supra* the Court also noted that the Commission is not bound by the findings of its examiner (administrative law judge), 419 U.S. at 288 n.4, 95 S.Ct. 438, 42 L.Ed.2d 447. Nevertheless the agency "must articulate a 'rational connection between the facts found and the choice made,'" quoting from *Burlington Truck Lines v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962). *Id.* at 285, 95 S.Ct. at 442. Finally, in summarizing the scope of judicial review the Court stated: "While we may not supply a reasoned basis for the agency's action that the agency itself has not given, . . . we will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Id.* at 285–86, 85 S.Ct. at 442 (citations omitted). In the present case the Commission considered the volume of traffic in auto parts being carried by the protesting truckers, the diversion of volume from these truckers if the application were granted and the existing imbalance of shipments between Detroit and Chicago. We discern in the Commission's findings a weighing of competing interests and a determination that the adverse effect upon

existing carriers of granting the application would outweigh any benefit to the public disclosed by the applicant's evidence. As the Court stated in *Bowman, supra,* this is precisely the type of judgment which the Commission is required to exercise. *Id.* at 293, 95 S.Ct. 438, 42 L.Ed.2d 447.

The second allegation by O–J of arbitrary and capricious action on the part of the Commission is not so readily disposed of by reference to traditional concepts of the respective roles of administrative agencies and reviewing courts. One of the bases of support of the application by Ford Motor Company was Ford's "strong commitment to assist and support in whatever way possible the establishment and growth of minority-owned businesses in the United States, and in the Detroit metropolitan area, specifically." In denying the application of O–J the Commission wrote—

Applicant has introduced evidence concerning its ownership by members of a particular ethnic group and seems to contend that such evidence should be the basis, at least in part, for a grant of motor carrier operating authority. Such evidence cannot play any role in a determination as to whether a grant of authority should be made herein. This agency is required to work within the framework of the Interstate Commerce Act and that statute requires us to consider each matter in the public interest as a whole. It does not provide us with any regulatory authority to favor any one group or individual over another for any such divisive reasons as race, creed, color, sex, or national origin. This agency is not empowered to change the legislative direction given by Congress, and any preferential treatment to a particular group or individual would be arbitrary and capricious in the absence of a legislative mandate. Therefore, in determining whether this application should be granted or denied, we will not give consideration to the race, creed, color, sex, or national origin of any of the parties to this proceeding.

120 M.C.C. at 703.

■ The essence of O–J's argument is that the Commission was required to consider the fact that it is owned by members of a minority race in determining whether public convenience and necessity required the application to be granted. In its brief O–J quotes from a number of opinions and treatises dealing with the meaning of "public convenience and necessity." While noting that public convenience and necessity is not defined in the statutes which establish it as a standard, these authorities agree that the word "necessity" as used in the phrase does not mean absolutely necessary or indispensable. Those actions within the sphere of regulated activity which are found to meet a public demand may be regarded as satisfying the necessity portion of the public convenience and necessity standard. O–J then argues that the public interest would be served by facilitating the entry of minority-owned trucking firms into a commercial activity such as that of transporting automobile parts. In support of this position O–J again cites numerous opinions of courts and the Interstate Commerce Commission holding that factors other than adequacy of existing carrier service must be considered in determining public convenience and necessity. *E. g., Nashua Motor Express, Inc. v. United States,* 230 F.Supp. 646 (D.N.H.1964); *Frozen Foods Express, Inc. v. United States,* 346 F.Supp. 254 (W.D.Tex.1972); *Pan-American Bus Lines Operation,* 1 M.C.C. 190 (1936); *Onley Refrigerated Transportation, Inc.—Food Stuffs and Drugs,* 118 M.C.C. 715 (1973).

A careful examination of the authorities cited by O–J reveals that the other factors referred to in these opinions relate directly to transportation services. In *New York Central Securities Corporation v. United States,* 287 U.S. 12, 53 S.Ct. 45, 77 L.Ed. 138 (1932), the Supreme Court was concerned with the provision of the Interstate Commerce Act, § 5(2), which permits the Commission to approve the acquisition of control by one carrier of another upon finding that it will be "in the public interest." The Court held that the criterion of "public interest" is not "a mere general reference to public welfare without any standard to

guide determinations." *Id.* at 24, 53 S.Ct. at 48. The Interstate Commerce Act and the Transportation Act were held to specify the considerations which make up the public interest as this criterion is applied by the Commission. These considerations all have reference to the transportation needs of the public as opposed to its general needs. This principle was recently reaffirmed by the Supreme Court in *National Association for the Advancement of Colored People v. Federal Power Commission,* —— U.S. ——, 96 S.Ct. 1806, 48 L.Ed.2d 284, 44 U.S.L.W. 4659 (1976). Similar language is found in *McLean Trucking Co. v. United States,* 321 U.S. 67, 79, 64 S.Ct. 370, 88 L.Ed. 544 (1944), where the Court held that the fact that Congress "has vested expert administrative bodies such as the Interstate Commerce Commission with broad discretion and has charged them with the duty to execute stated and specific statutory policies . ." does not "necessarily include either the duty or the authority to execute numerous other laws." The Court pointed out that the task of the Interstate Commerce Commission is to enforce certain legislation dealing specifically with transportation facilities, services and problems and that the policies expressed in such legislation "must be the basic determinants of its action." *Id.* at 80, 64 S.Ct. at 377. Nevertheless, the Court cautioned that the Commission could not ignore governmental policies reflected in other legislation enacted to deal with different problems.

■ The Interstate Commerce Commission is primarily concerned with insuring that the public has available for its use systems of transportation which are safe, adequate, economical and efficient. Congress has delegated broad discretionary powers to the Commission in making determinations of public convenience and necessity. When considerations other than those strictly concerned with transportation are found nevertheless to affect the transportation-related convenience and needs of the public they may be considered by the Commission. *National Bus Traffic Association, Inc. v. United States,* 284 F.Supp. 270 (N.D.

Ill.1967), *aff'd per curiam,* 391 U.S. 468, 88 S.Ct. 1847, 20 L.Ed.2d 750 (1968). This position was clearly stated by the Commission in *Elegante Tours, Inc.—Broker Application,* 113 M.C.C. 156, 160 (1971), where it wrote:

> What the examiner's report in this proceeding failed to recognize is the essential difference between a grant of authority based on ethnic, racial, or language considerations as contrasted to a grant of authority serving the demonstrated needs of a particular class of users. Clearly, we are required under the national transportation policy to provide fair and impartial regulation and to promote safe, adequate, economical, and efficient transportation services (49 U.S.C. preceding section 1). A grant of authority predicated on ethnic, racial, or language considerations is improper.

> Consistent with our statutory responsibilities, some grants of authority are made either where a need has been shown to serve a particular class of users of a proposed service or where it has been shown that a distinctive kind of service would fulfill a demonstrated need. That is to say, if existing services are not providing an adequate service to any segments of the public, a grant of authority to an applicant to cure this defect does not evince a discriminatory grant but is, instead, a grant to provide a needed service.

There was no showing in the present case that the transportation needs of the public as opposed to the general public welfare would be served by the entry of minority-owned carriers into the business of hauling automobile parts between the locations set out in O–J's application.

As the Court of Appeals for the District of Columbia noted in *National Association for the Advancement of Colored People v. Federal Power Commission,* 520 F.2d 432 (1975), which decision has been affirmed by the Supreme Court, — U.S. ——, 96 S.Ct. 1806, 48 L.Ed.2d 284, 44 U.S.L.W. 4659 (1976), Congress has dealt with the plight of minorities in this country in many legislative acts without assigning responsibility for this problem to existing regulatory agencies. The court reasoned that—

> . . . Congress may have felt that other significant goals would be inadequately served if the attentions of the agencies set up to pursue them were divided. The Commission's [(FPC)] principal task of passing on statutorily specified license and rate applications is prodigious. To perform it, a staff has been built up of specialists in the technical aspects of gas and electric power production and distribution. The unfamiliar problem of employment discrimination regulation might divert an inordinate amount of their energies and skills from the ends to which these are most productively applied. *Id.* at 436. (footnote omitted).

The same observations might accurately be made about the Interstate Commerce Commission. The task of enforcing the transportation policies of the nation is an enormous one. The skills of the Commission's staff are not those required to implement an affirmative action program designed to enlarge the opportunities of minority-owned and operated businesses. The public interest which Congress intended the Interstate Commerce Commission to promote and protect is one related to transportation, not the more general public interest in the sense of the general welfare. While we agree with the dissenting member O'Neal that the language of the majority in the Report of the Commission is too broad if read to mean that evidence of ownership by a particular ethnic group can never play a role in the determination of whether to grant authority, we find it was not a proper consideration in the present case because it was totally unrelated to the transportation needs of the public.

This court is aware of the problems which minority-owned businesses encounter in getting established. This is particularly true in the field of motor transportation where a "grandfather clause" ensured the certification of existing carriers at a time when black business ownership was rare. Nevertheless, Congress has not chosen to

require the Commission to consider minority ownership as a separate factor in determining public convenience and necessity and it is beyond our authority to impose such a requirement.

The petition for review is denied.