AMERICAN TRUCKING ASSOCIATION,
INC., Petitioner,

v.

UNITED STATES of America and
Interstate Commerce Commission,
Respondents.

AMERICAN MOVERS CONFERENCE,
Petitioner,

v.

INTERSTATE COMMERCE COMMIS-
SION and the United States of
America, Respondents.

C & H TRANSPORTATION CO., INC.
et al., Petitioners,

v.

INTERSTATE COMMERCE COMMIS-
SION and United States of
America, Respondents.

Nos. 80–1214, 80–1225 and 80–1198.

United States Court of Appeals,
Fifth Circuit.

April 17, 1981.

Kenneth E. Siegel, Washington, D. C., for appellant.

Gary D. Dunbar, Atty., Washington, D. C., for Regular Common Carrier Conference Inc.

Richard P. Watson, Watson & Rockford, Indianapolis, Ind., for Mayflower Warehousemen's Assn., Inc.

David Earl Tinker, Washington, D. C., for Belknap Van & Storage of San Antonio, Inc., et al.

Denning & Wohlstetter, Alan F. Wohlstetter, Stanley I. Goldman, Washington, D. C., for Imperial Van Lines, Inc., et al.

Thomas E. James, Dallas, Tex., Phillip Robinson, James M. Doherty, Doherty, Birnbaum & Munson, Austin, Tex., for C & H Transp. Co., Daily Express and intervenors Dealers Transit, Inc., et al.

Gregory A. Stayart, Daniel C. Sullivan, Chicago, Ill., for intervenor Assure Competitive Transp.

Donald W. Smith, Indianapolis, Ind., for Sammons Trucking.

Robert B. Nicholson, Evelyn G. Kitay, Kathy M. Dollar, Richard A. Allen, ICC, Washington, D. C., for the ICC.

Jacob P. Billig, Billig, Sher & Jones, Mark J. Fritz, Washington, D. C., for Minority Trucking Transp. Development and Alliance Moving & Storage.

Fritz R. Kahn, Member, Committee on Regulatory Reform, Washington, D. C., for Motor Carrier Lawyers Assn.

A. Charles Tell, Baker & Hostetler, Columbus, Ohio, for Ace Doran Hauling & Rigging Co.

Before THORNBERRY, RANDALL and TATE, Circuit Judges.

THORNBERRY, Circuit Judge:

The petitioners in these consolidated cases ask us to review final rules adopted by the Interstate Commerce Commission in Ex Parte No. MC–107, *Transportation of Government Traffic*, 131 M.C.C. 845 (1979). These rules established a simplified licensing procedure for motor carriers proposing to transport traffic on behalf of the United States. For the reasons that follow, we affirm.

I. *Background*

This rulemaking proceeding was initiated when the Minority Trucking Transportation Development Corporation (MTTDC) asked the Commission to remedy a lack of representation of disadvantaged persons in the transportation field and, in particular, to focus on the difficulty in obtaining contracts for government traffic. The Commission issued an interim decision in July 1978, identifying two major objectives for the proposed rules: (1) allowing government agencies to tender a fair portion of their freight shipments to small businesses and those operated by disadvantaged persons, and (2) spurring competition in bidding for government traffic. Ex Parte No. MC–107, *Transportation of Government Traffic*, 129 M.C.C. 623 (1978). The Commission tentatively decided to expand the rulemaking to include all truckers, not just those economically disadvantaged. The Commission provisionally found that the present and future public convenience and necessity require the licensing of qualified applicants to transport government traffic upon a demonstration of fitness to perform the service, and that this finding was reasonable, necessary, and consistent with the national transportation policy and the in-

tent of Congress. In January 1980, the Commission issued its decision re-examining the interim decision in light of numerous statements submitted in response to that decision as well as a staff study of economic impact, and concluded that the regulations should be implemented. The final rules became effective March 18, 1980. 45 Fed. Reg. 3586–88.

The rules simplified licensing procedures for motor carriers proposing to transport traffic of the federal government by allowing qualified applicants to operate under a master certificate, which eliminated the need for each applicant to show in an individual adjudicatory proceeding that its application was consistent with the public convenience and necessity. In MC–107, the Commission made a general finding that the present and future public convenience and necessity require operation by any qualified motor carrier in the transportation of general commodities (with certain exceptions) where the traffic is handled for the United States and the total benefit inures to the government. A carrier may request authority simply by filing a sworn, notarized letter containing certain information concerning its designated agent, insurance coverage, and fitness. Because of the general finding of need, other carriers protesting the application can only challenge the applicant's fitness and capacity to perform the proposed service and to conform to the Interstate Commerce Act.

C & H Transportation, Inc., American Trucking Associations, Inc., and the American Movers Conference filed petitions in this court for review of this final ICC decision. Both the Commission and this court denied petitioners' request for stay pending judicial review. Other interested parties intervened.

On July 1, 1980, the Motor Carrier Act of 1980, Pub.L. No. 96–296, 94 Stat. 793, was signed into law, amending certain provisions of subtitle IV of title 49, United States Code, to provide for more effective regulation of motor carriers. Although the Act states that the Commission may no longer make public convenience and necessi-

ty determinations based on general findings developed in rulemaking proceedings, as it did in this case, the Act adopts standards for government traffic that are very similar to the rules at issue here. The statute eliminates the need for carriers desiring to carry government traffic (other than used household goods) to show that the application is consistent with the public convenience and necessity; the applicant need only show that he is fit to perform the service. Motor Carrier Act § 5(a), *amending* 49 U.S.C. § 10922.

To implement the new Act, the Commission repealed the MC-107 rules and no longer accepts applications under them. The Commission also has issued interim rules establishing procedures for applying for authority to transport government traffic under the new Act. Although the significance of this case has been substantially reduced,[1] the MC-107 rules did form the basis for a significant number of government traffic applications published or granted before July 1, 1980, and for that reason the case is not entirely moot.

We must consider the following issues: (1) whether the Commission properly used the informal rulemaking procedure to make a general prospective finding of public convenience and necessity; (2) whether the Commission properly considered and applied the controlling legal standards for determining public convenience and necessity; and (3) whether the Commission complied with the requirements of the National Environmental Policy Act of 1969 and the Energy Policy and Conservation Act of 1975.[2]

## II. *Standard of Review*

■ Because we lack the knowledge and experience needed to evaluate the transportation requirements of the nation, we accord the Commission a great deal of discretion and appropriately defer to its expertise. We are to review this informal rulemaking conducted under § 553 of the Administrative Procedure Act (APA) only to determine whether the agency action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The scope of review is narrow. We neither weigh the evidence before the Commission nor assess the wisdom of the rule promulgated, and we inquire into the soundness of the Commission's reasoning only to determine that its conclusions are rationally supported. *United States v. Allegheny-Ludlum Steel Corp.*, 406 U.S. 742, 749, 92 S.Ct. 1941, 1946, 32 L.Ed.2d 453 (1972). Our task is to ensure that the agency considered all relevant factors and avoided clear errors in judgment. *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 285, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974). The agency must articulate a rational connection between the facts as it finds them and the conclusion it premises on those facts. *Id.* We cannot supply a reasoned basis for agency action that the agency itself has not given, but "we will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Id.* at 285-86; 95 S.Ct. at 442.

## III. *The Master Certificate Approach*

■ We are satisfied that the Commission was entitled to use an informal notice and comment procedure under its rulemaking authority to make a general finding of public convenience and necessity. *Chemical Leaman Tank Lines, Inc. v. United States*, 368 F.Supp. 925 (D.Del.1973). *See also*

---

1. As a result of the passage of the Motor Carrier Act of 1980, some but not all of the petitioners and intervening petitioners in each of these consolidated cases have filed or joined in motions to dismiss their petitions for review or intervention. These motions are hereby granted.

2. We reject at the outset the argument by intervening petitioner Assure Competitive Transportation, Inc., that because the President had un-

reasonably delayed or intentionally declined to appoint a full complement of eleven Commissioners, the Commission decision under review is somehow constitutionally infirm. We think it sufficient to note that this same argument was raised and rejected in *Assure Competitive Transportation, Inc. v. United States*, 629 F.2d 467 (7th Cir. 1980), *cert. denied,* —— U.S. ——, 101 S.Ct. 941, 67 L.Ed.2d 110 (1981).

United States v. Florida East Coast Railway Co., 410 U.S. 224, 93 S.Ct. 810, 35 L.Ed.2d 223 (1973); American Trucking Associations, Inc. v. United States, 344 U.S. 298, 73 S.Ct. 307, 97 L.Ed. 337 (1953); American Trucking Associations, Inc. v. United States, 602 F.2d 444 (D.C.Cir.), cert. denied, 444 U.S. 991, 100 S.Ct. 522, 62 L.Ed.2d 420 (1979). We need add nothing to the thorough discussion by the Chemical Leaman court explaining why neither the APA nor the Motor Carrier Act then in effect prevented the Commission from making a prospective finding of public convenience and necessity for a broad class of motor carrier traffic. 368 F.Supp. at 932–40. Nonetheless, certain petitioners continue to argue that applications to operate under the master certificate were mere procedural formalities and that the MC–107 decision therefore constituted "licensing" requiring adjudication. We disagree, noting the distinction between MC–107's advance declaration of licensing criteria and the subsequent acknowledgment of an applicant's right to operate under the master certificate.

We do agree that the MC–107 guidelines narrow dramatically the range of issues to be resolved before a carrier will receive authority to operate, but, as recognized by the Chemical Leaman court, the Supreme Court has upheld an agency's power to declare through rulemaking prospective general licensing criteria, even where those criteria may summarily decide the fate of later license applications. 368 F.Supp. at 935, citing United States v. Storer Broadcasting Co., 351 U.S. 192, 76 S.Ct. 763, 100 L.Ed. 1081 (1955); Federal Power Commission v. Texaco, Inc., 377 U.S. 33, 84 S.Ct. 1105, 12 L.Ed.2d 112 (1963). MC–107 serves only to define the conditions under which an applicant will be permitted to operate under the master certificate. An individual carrier is in no sense permitted to operate or otherwise "licensed" until it demonstrates compliance with those conditions and its fitness to perform the proposed services. The applicant's compliance and fitness are clearly subject to challenge by a competitor in an adjudicatory proceeding.

IV. Public Convenience and Necessity

The standards for the issuance of certificates to motor carriers require that the Commission find that the applicant "is fit, willing, and able ... to provide the transportation to be authorized by the certificate" and that "the transportation to be provided under the certificate is or will be required by the present or future public convenience and necessity." 49 U.S.C. § 10922(a). In deciding whether a proposed service is or will be required by the present or future public convenience and necessity, the Commission determines (1) whether the proposed operation or service will serve a useful public purpose, responsive to a public demand or need; (2) whether the need can be served as well by existing carriers; and (3) whether the proposed service or operation will endanger or impair the operations of existing carriers contrary to the public interest. Sharron Motor Lines, Inc. v. United States, 633 F.2d 1115 (5 Cir. 1981), citing Pan-American Bus Lines Operation, 1 M.C.C. 190, 203 (1936).

Petitioners attack the dual objectives of MC–107. Those objectives, as stated by the Commission, were (1) to allow government agencies to gear a fair portion of their freight shipments to small businesses and those operated by disadvantaged persons, and (2) to promote competition in the bidding for the transportation business of the government. We agree with petitioners that the Commission to some extent distorted the first Pan-American standard when it concluded that a system promoting minority and disadvantaged involvement satisfies that first criterion. We agree that such a system in some sense serves a "useful purpose" and that there may be a "public need" for promoting that involvement, but we must consider those words in the context of the Pan-American case and the transportation industry, not in the context of every social problem we might be inclined to redress. We think that "useful purpose" and "public need" in the Pan-American sense surely refer to the actual provision of transportation services, the

physical movement of goods, and not to the pursuit of affirmative action goals.[3] Nonetheless, the Commission's second objective, the promotion of competition, does relate directly to the provision of transportation services and for the reasons that follow provides a basis for upholding the Commission decision in spite of the articulated first objective.

Petitioners contend that, in pursuing or promoting competition, the Commission has in effect deregulated a segment of the transportation industry. Deregulation, they argue, is a decision for Congress, not for the Commission. Further, they argue that competition may not serve as the exclusive or primary basis for additional motor carrier services. We find no merit in these contentions.

 The Supreme Court has recognized that even though Congress has chosen to protect the public interest primarily through regulation, the Commission is entitled to consider a policy of promoting a competitive market structure. *Bowman Transportation*, 419 U.S. at 297–98, 95 S.Ct. at 448. The Commission, in carrying out its mandate to insure "safe, adequate, econom-

ical, and efficient service," National Transportation Policy, 49 U.S.C. § 10101, may conclude that the benefits of competitive service to consumers might outweigh the discomforts existing certificated carriers would feel as a result of the new entries. *Id.* The Commission is further charged with "encourag[ing] sound economic conditions in transportation, including sound economic conditions among carriers" and "encourag[ing] the establishment and maintenance of reasonable rates for transportation without unreasonable discrimination or unfair or destructive competitive practices. . . ." National Transportation Policy, 49 U.S.C. § 10101. We have previously said that in determining the public need, the Commission must consider the possible benefits of increased competition. *Sharron Motor Lines*, 633 F.2d at 1118; *North Alabama Express, Inc. v. United States*, 576 F.2d 679, 682 (5th Cir. 1978); *P. C. White Truck Line v. ICC*, 551 F.2d 1326 (D.C.Cir. 1977). Thus, both the national transportation policy and the public convenience and necessity allow consideration of competition, and a general policy in favor of competition is open to the Commission. Further,

---

**3.** In *NAACP v. FPC*, 425 U.S. 662, 96 S.Ct. 1806, 48 L.Ed.2d 284 (1976), the Supreme Court noted that it had consistently held that the use of the words "public interest" in a regulatory statute is not a broad license to promote the general public welfare. Those words are to take meaning from the purposes of the regulatory legislation. In construing the Federal Power Act, 16 U.S.C. § 791a *et seq.*, and the Natural Gas Act, 15 U.S.C. § 717 *et seq.*, the court concluded that the "public interest" standard in those acts "is not a directive to the Commission to seek to eradicate discrimination, but, rather, is a charge to promote the orderly production of plentiful supplies of electric energy and natural gas at just and reasonable rates." 425 U.S. at 670; 96 S.Ct. at 1812.

In the transportation context, we are persuaded by the reasoning in *O–J Transport Co. v. United States*, 536 F.2d 126, 131–33 (6th Cir.), *cert. denied*, 429 U.S. 960, 97 S.Ct. 386, 50 L.Ed.2d 328 (1976), wherein the court, relying on *NAACP v. FPC*, held that in motor carrier licensing cases:

The skills of the Commission's staff are not those required to implement an affirmative action program designed to enlarge the opportunities of minority-owned and operated businesses. The public interest which Con-

gress intended the Interstate Commerce Commission to promote and protect is one related to transportation, not the more general public interest in the sense of the general welfare. . . . Congress has not chosen to require the Commission to consider minority ownership as a separate factor in determining public convenience and necessity and it is beyond our authority to impose such a requirement.

536 F.2d at 131–33. We think that racial, ethnic, and socio-economic factors can only be considered in the public convenience and necessity determination when they relate to the nature of the transportation service proposed by an applicant and to the transportation needs of the public, such as carrier proficiency in a foreign language that would enable the carrier to provide special services required by an ethnic group. *See, e. g., Elegante Tours, Inc.— Broker Application*, 113 M.C.C. 156 (1971); *Bracera Transportation Co., Inc.—Migrant Workers*, 78 M.C.C. 461 (1958). There was no showing in the present case that the transportation needs of the public as opposed to the general public welfare would be served by the promotion of minority or disadvantaged participation in the transportation business of the government.

the fact that the rates charged on government traffic moving pursuant to section 22 of the Interstate Commerce Act, 49 U.S.C. § 10721, are exempt from regulation is at least some evidence of a congressional policy favoring competitive rates for government traffic. The Commission could, within its legitimate authority, rationally insist on competition in the provision of transportation services for the government.

The ICC Office of Policy and Analysis (OPA) provided the Commission with a study of the economic and other impacts of the special licensing procedures proposed in MC-107. This study responded directly to various questions raised by the interim decision and in the numerous comments received in reaction to the interim decision.

The OPA report first described in detail the procedures for government procurement of transportation and the practices of the agencies involved. Government transportation business is primarily obtained pursuant to the provisions of 49 U.S.C. § 10721, Government Traffic, and through two agencies—the Military Traffic Management Command (MTMC) for the Department of Defense and the General Services Administration (GSA) for other federal agencies. The report reviewed the history, scope, and purpose of section 10721, and then considered the particular requirements and policies of different agencies (addressing all aspects of the transportation business: carrier selection and evaluation, rate tenders, negotiations, affirmative action programs, special handling requirements, and so forth). OPA then developed a profile of government traffic, using data gathered from both published and internal documents of the MTMC and the GSA, as well as information gleaned from a sample of all government bills of lading (GBL's) for the year 1975. It analyzed this traffic data on the basis of numerous characteristics including type of shipper, mode used, weight and distance of shipment, use of section 10721, payment time and revenue contribution. The analysis then focused on the characteristics of motor carrier traffic for the government, again analyzing the data by commodity type, weight of shipment,

origin-destination pairs, mileage bracket, use of section 10721 rates, carrier class, seasonality, and revenue contribution. Finally, having presented the data on which it primarily relied, OPA analyzed each of the major issues related to the economic impact of the MC-107 proposal.

OPA reached the following conclusions. It admitted to some uncertainty whether the proposed rules would achieve both of the Commission's objectives. An increase in the number of new entrants would lead to greater service competition, but the extent to which rate competition was enhanced would be largely determined by the specific procurement practices and procedures different government agencies continued to use. OPA noted that the master certificate approach would enable government agencies to expeditiously obtain entry of new carriers where needed, thus giving the government greater flexibility in meeting emergency and defense requirements. The bottom line of the report was that the Commission could attain its objectives through the use of the MC-107 entry procedures; the extent to which those objectives were attained would depend on industry practice and government procurement policy subsequent to implementation of the rules.

Given this probability of increased competition and the benefits that would flow from that competition, we think the Commission could rationally conclude that carrier entry under the master certificate would serve a useful public purpose, in response to a public demand or need.

Petitioners argue that eased entry under the master certificate will endanger or impair the operations of existing carriers, and that these carriers are already providing adequate service to the government. The Commission, however, need not specifically find that existing service is inadequate. *United States v. Dixie Highway Express, Inc.*, 389 U.S. 409, 88 S.Ct. 539, 19 L.Ed.2d 639 (1967); *Chem-Haulers, Inc. v. United States*, 536 F.2d 610, 623 (5th Cir. 1976). And although the record suggests

that the operations of existing carriers might to some extent be disrupted, that disruption is inherent in a competitive environment, and the Commission has rationally concluded that a competitive market for the transportation business of the government is in the public interest. To prove the Commission wrong, we think petitioners would have to show that the new operations would promote inefficiency and waste or destroy the ability of existing carriers to compete. Injury to existing carriers through competition becomes relevant only when there is a corresponding injury to the public. *May Trucking Co. v. United States*, 593 F.2d 1349, 1356 (D.C.Cir.1979).

For the reasons above, we are satisfied that the Commission could rationally conclude that the transportation provided under the master certificate is or will be required by the present or future public convenience and necessity.

### V. *Compliance with NEPA and EPCA*

The National Environmental Policy Act (NEPA) requires a formal environmental impact statement for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); *Texas Committee on Natural Resources v. Bergland*, 573 F.2d 201 (5th Cir. 1978). The Energy Policy and Conservation Act (EPCA) requires the Commission, where practicable, to include in any major regulatory action a statement of that action's probable impact on energy efficiency and energy consumption. 42 U.S.C. § 6362(b). Petitioners have argued that the Commission failed to comply with the provisions of either act. We disagree.

■ We find absolutely no merit in the contention that the Commission failed to comply with the EPCA. Congress has not thought it appropriate to require that the energy impact statement called for by the EPCA be as elaborate or as formal as the environmental impact statement required by NEPA. *Delta Air Lines, Inc. v. CAB*, 561 F.2d 293, 302–05 (D.C.Cir.1977). The interim and final decisions as well as the staff study on environmental impact leave

no doubt that energy factors received timely and sufficient consideration. The Commission concluded that any impact on energy consumption was unlikely; in any event, whatever impact that might occur was justified as being consistent with the public convenience and necessity.

The Commission determined that an environmental impact statement was unnecessary. The standard for review of that determination is whether it was reasonable. We determine whether the agency adequately considered the values set forth in NEPA and the potential environmental effects of the proposal before reaching its decision that a statement was not necessary. If the agency engaged in this analysis and reasonably concluded that an impact statement was not required, we will not disturb that conclusion. *Sierra Club v. Hassell*, 636 F.2d 1095, 1097–98 (5th Cir. 1981); *Save the Bay, Inc. v. U. S. Corps of Engineers*, 610 F.2d 322 (5th Cir. 1980); *Save Our Ten Acres v. Kreger*, 472 F.2d 463 (5th Cir. 1973). We think the Commission could reasonably conclude that this rulemaking would not significantly affect the quality of the human environment.

■ In the interim decision, the Commission recognized its obligation to consider the impact of its proposal on the environment, and although it tentatively concluded that the proposed rules would not adversely affect the quality of the environment, the Commission requested further specific comment on this issue. The Commission directed its staff to assess the environmental impact of MC–107. The staff study considered areas of possible impact including safety, rural and community development, intermodal competition, and energy consumption, and concluded that any adverse effects in these areas would be insignificant. The assessment as published is admittedly concise, but we note that the Commission, prior to its final decision, had before it not only this staff assessment, but the OPA study of the economic impact of the proposed rules as well as the comments filed in response to the interim decision.

The argument that the environment will be adversely affected is premised on the notion that unlimited new entry will promote deleterious competition, resulting in gross inefficiency and waste. But as discussed previously, the Commission rationally determined that competitive conditions in the government transportation market were likely to encourage sound economic conditions and promote safe, adequate, economical, and efficient service, and thus were not likely to result in the waste and inefficiency described by petitioners. Although this determination does not foreclose the possibility of *any* adverse effects on the environment, we think it is a sufficient basis for the agency to reasonably conclude that any impact on the environment would be insignificant.

AFFIRMED.