**NORTH AMERICAN VAN LINES, INC., Allied Van Lines, Inc., American Movers Conference, Inc., Aero Mayflower Transit Co., Inc., Atlas Van Lines, Inc., and United Van Lines, Inc., Petitioners,**

v.

**INTERSTATE COMMERCE COMMISSION and United States of America, Respondents.**

**AMERICAN RED BALL TRANSIT CO. and Household Goods Carriers Bureau, Inc., Petitioners,**

v.

**INTERSTATE COMMERCE COMMISSION and United States of America and Consumers Union of United States, Inc., Respondents.**

Nos. 81–1724, 81–1726.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 23, 1981.

Decided Dec. 9, 1981.

---

David L. Schiavone, Chicago, Ill., for petitioners.

Roger K. Davis, Consumers Union of U. S., Inc., H. Glenn Scammel, I. C. C., Washington, D. C., for respondents.

Before PELL and CUDAHY, Circuit Judges, and DUMBAULD,* Senior District Judge.

· DUMBAULD, Senior District Judge.

"Deregulation" is the current "buzzword" with respect to all forms of transportation. Beginning under the Jimmy Carter administration with the Airline Deregulation Act of October 24, 1978, 92 Stat. 1705, 49 U.S.C. § 1301 *et seq.* whose title describes it as an Act "to encourage, develop, and attain an air transportation system which relies on competitive market forces to determine the quality, variety, and price of air services,"[1] the increased reliance on what President Ronald Reagan has called "the magic of the market place" was extended to motor carriers by the Act of July 1, 1980, 94 Stat. 793, 49 U.S.C. § 10101, and to railroads by the Act of October 14, 1980, 94 Stat. 1895, 49 U.S.C. § 10101 (known from the name of its House sponsor, as the "Staggers Rail Act of 1980"). Likewise, one day later, the Household Goods Transportation Act of October 15, 1980, 94 Stat. 2011, 49 U.S.C. § 10101 note, with which we are concerned in the case at bar, was enacted.

Historians might philosophize that excessive reliance upon market forces may prove

---

* The Honorable Edward Dumbauld, Senior District Judge of the Western District of Pennsylvania, sitting by designation.

1. The Act of February 15, 1980, Pub.L. 96–192, 94 Stat. 35, undertook "to promote competition in international air transportation."

shortsighted and resurrect some of the ancient evils which led to the enactment in 1887 of the Interstate Commerce Act in the first place. Was it not the uninhibited operation of marketplace forces which enabled John D. Rockefeller's Standard Oil Company to obtain from railroads a rebate, not only upon its own traffic, but also upon that of its competitors? Be that as it may, it is for the courts and the Interstate Commerce Commission to carry out with fidelity the policies and provisions of legislation as formulated by the Congress.

Section 2(a) of the Household Goods Transportation Act contains the following declaration of policy:

The Congress hereby finds—

(1) that a safe, stable, and financially sound system of transportation of household goods by motor common carriers is vital to the maintenance of a strong national economy and strong national defense;

(2) that the best means of assuring such a system is through competition and reduced regulation;

(3) that maximum flexibility on the part of the carriers in the pricing of their services best serves the shippers of household goods and allows a variety of quality and price options to meet market demands; and

(4) that the interest of individual shippers can be best protected by allowing carriers of household goods maximum flexibility in serving the needs of their shippers, by providing accurate and complete information concerning carriers' performance and individual shippers' rights and remedies, by reducing the amount of unnecessary regulations, and by strengthening remedies for violations of those regulations that are necessary for protection of individual shippers.

Various specific new rules were included in the Act in response to historically experienced abuses and complaints frequently put forward by shippers. 49 U.S.C. 10734 authorized non-preferential, non-predatory rates for transportation based upon a binding estimate. Guaranteed pick-up and de-livery time is also authorized (provided the carrier makes available a [lower] rate without such guaranteed service).

These innovations were inspired by the proverbially prevalent practice of issuing low estimates and then upon delivery exacting from the shipper charges based upon higher actual weights. Complaints about failure to meet pick-up and delivery promises were also rampant in the industry.

49 U.S.C. § 11711 provides for establishment of dispute settlement procedures for disputes between carriers and shippers. 49 U.S.C. § 11917 makes willful use of fraudulent weights ("weight-bumping") a crime.

49 U.S.C. § 11110 authorizes issuance of regulations by the Commission:

(a)(1) The regulations and paperwork required of motor common carriers providing transportation of household goods . . . shall be minimized to the maximum extent feasible consistent with the protection of individual shippers.

(2) The Interstate Commerce Commission may issue regulations, including regulations protecting individual shippers, in order to carry out this subtitle with respect to the transportation of household goods by motor common carrier.

(3) Regulations of the Commission protecting individual shippers shall include, where appropriate, reasonable performance standards for the transportation of household goods. . . . In establishing performance standards under this paragraph, the Commission shall take into account at least the following:

(A) the level of performance that can be achieved by a well managed motor common carrier transporting household goods;

(B) the degree of harm to individual shippers which could result from a violation of the regulation;

(C) the need to set the level of performance at a level sufficient to deter abuses which result in harm to consumers and violations of regulations;

(D) service requirements of the carriers;

(E) the cost of compliance in relation to the consumer benefits to be achieved from such compliance; and

(F) the need to set the level of performance at a level designed to encourage carriers to offer service responsive to shipper needs.

(4) Nothing in this section shall be construed to limit the Commission's authority to require reports from motor common carriers providing transportation of household goods or to require such carriers to provide specified information to consumers concerning their past performance.

(b)(1) Every motor common carrier providing transportation of household goods ... may, upon request of a prospective shipper, provide the shipper with an estimate of charges for transportation of household goods and for the proposed services. The Commission shall not prescribe specific formulas, forms, methods, or techniques for providing a prospective shipper with such an estimate. The Commission shall not prohibit any such carrier from charging a prospective shipper for providing a written, binding estimate for the transportation and proposed services, nor shall the Commission require the final charges to a shipper to be based on an estimate.

(2) Any charge for an estimate of charges provided by a motor common carrier to a shipper for transportation of household goods ... shall be subject to the antitrust laws ...

(c) The Commission shall issue regulations that provide motor carriers providing transportation of household goods ... with the maximum possible flexibility in weighing shipments, consistent with assurance to the shipper of accurate weighing practices. The Commission shall not prohibit such carriers from back-weighing shipments or from basing their charges on the reweigh weights if the shipper observes both the tare and gross weighings (or, prior to such weighings, waives in writing the opportunity to ob-

serve such weighings) and such weighings are performed on the same scale.

In response to this mandate, the Commission promptly on October 16, 1980, issued a notice of proposed rulemaking (amended October 27, 1980) accompanied by a draft of proposed revised operational regulations. 45 days were allowed for comments, and comments were filed by over 100 individuals and organizations, including petitioners, the Department of Transportation (DOT), the GSA, the U.S. Office of Consumer Affairs, and the Consumers Union of United States, Inc. Making some modifications in response to comments received, the Commission on March 11, 1981, issued its final operational rules. At the same time it invited comments on a draft of certain proposed performance standards.

Petitioners invoked the jurisdiction of this Court under 28 U.S.C. §§ 2321(a), 2342(5), and 2349, on May 7, 1981, alleging that the regulations adopted by the Commission violate the Act pursuant to which they were issued. The effective date of the regulations has been stayed by orders of this Court pending consideration of the case.

Petitioners begin their attack on the regulations with the rhetorical objection that they increase paperwork, rather than reducing it in accordance with 49 U.S.C. § 11110(a)(1), quoted *supra*.

This is a rather subjective type of requirement, expressing, as Judge Learned Hand might say, "a mood rather than a command" [*Reeves v. Anderson*, 43 F.2d 679, 682 (C.C.A. 2, 1930)], and a reviewing court could not appropriately invalidate a corpus of regulations on this ground in the absence of a flagrant showing of bad faith on the part of the agency involved. No such showing has been offered here. Indeed, at argument counsel were unable to indicate in quantitative terms either the comparative verbosity of the new and old regulations or the comparative amounts of paperwork necessitated by compliance therewith.[2] The Commission in its October

2. Compare the statement of Mr. Justice Bran-    deis, who had a passion for accuracy wherever

27, 1980, notice professed its intention to adopt new regulations "in conformity with the Household Goods Transportation Act of 1980" and its purpose "to reduce the paperwork burden" on carriers, and "to eliminate regulation to the maximum extent feasible." Under the circumstances, we cannot conclude that the new regulations are invalid by reason of verbosity, especially when 49 U.S.C. § 11110(a)(1) itself requires minimization of paperwork only "to the maximum extent feasible *consistent with the protection* of individual shippers," and subsection (a)(2) goes on to authorize expressly the issuance of "regulations protecting individual shippers." All the regulations under attack can be substantially justified by the Commission as needed for the protection of shippers, upon the basis of historically demonstrated industry abuses and shipper complaints.

■ Turning to another procedural objection raised by petitioners, we find no merit in their argument that the Commission should have adopted their suggestion of formulating "zero-based regulations," *i.e.* regulations dreamed up *de novo*, on a clean slate, starting from scratch, without looking at the prior regulations to be superseded by the new ones. This contention flies in the face of the statutory mandate in Section 6(b) of the 1980 Act which directs the Commission to *"review and revise"* [italics supplied] all of its "operational regulations pertaining to transportation of household goods." To "review" requires consideration of the old before discarding it. To "revise" does not necessarily mean to supplant by something entirely different.

■ Similarly meretricious is the contention that the review and revision of "operational regulations" must simultaneously include formulation of "performance standards." The mandate to "review and revise" contained in 6(b) is obviously a transitional measure, to be undertaken within 60 days and concluded within 270 days after enactment of the 1980 statute, to carry out the purposes of 49 U.S.C. § 11110(a).

On the other hand, issuance of "regulations protecting individual shippers" is a continuing task which may be performed from time to time *pro re nata*. Likewise the authority granted by 49 U.S.C. § 11110(a)(3) to "include, where appropriate, reasonable performance standards" in the regulations for shipper protection is similarly of an ongoing nature. Reasonable performance might obviously vary from time to time in accordance with technological developments relating to speed of vehicles, cushioning devices to prevent damage, and the like. Exercise of this authority, designed for protection of shippers, is plainly not a "one-shot" deal, but an ongoing task. The Commission clearly has discretion to treat performance standards in a separate proceeding, especially when the responses with respect to this topic were meager in the original comments invited by the October 27, 1980, notice.

■ Another procedural contention advocated by petitioners is that the Commission did not allow the industry sufficient time to adequately study, evaluate, and comment upon the proposed regulations. This contention is without merit. As petitioners acknowledge in their briefs, the Commission extended the statutorily required comment period from 30 to 45 days. Nor was the Commission required to hold an oral hearing or afford petitioners an opportunity for cross-examination and rebuttal of the evidence upon which it relied. The distinction between quasi-legislative rulemaking such as this, and quasi-judicial agency proceedings is explicitly recognized and embodied in the Administrative Procedure Act. Compare 5 U.S.C. § 553 (1976) with *id.* § 554. Absent compelling circumstances, not present here, once an agency has fulfilled the statutory requirements governing a § 553 rulemaking, its decision may not be subjected to any additional procedural restraints. *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council*, 435 U.S. 519, 546–49, 98 S.Ct. 1197, 1213–14, 55 L.Ed.2d 460 (1978).

---

attainable, that the "weight of the evidence" amounted to 67 pounds avoirdupois in *B. & O.*

*R. R. v. U. S.*, 298 U.S. 349, 381, 56 S.Ct. 797, 813, 80 L.Ed. 1209 (1936).

A reviewing court should set aside agency regulations promulgated in an informal rulemaking proceeding only if they are "arbitrary, capricious, an abuse of discretion or otherwise contrary to law." *City Federal Savings and Loan Ass'n. v. Federal Home Loan Bank,* 600 F.2d 681, 688 (7th Cir. 1979); 5 U.S.C. § 706(2)(A) (1976). Under this standard, a court must defer to agency expertise and may not substitute its judgment for that of the administrative agency. 600 F.2d at 688–89; *American Trucking Ass'n., Inc. v. United States,* 642 F.2d 916, 920 (5th Cir. 1981).

Turning to substantive attacks which petitioners urge concerning the contents of the regulations, we find that these are also plausible arguments *ad captandum* but lacking in substance. For the most part the evils apprehended could be averted by common-sense administrative practices on the part of the carriers.

■ Thus it is contended that to require the carriers to provide the shipper a copy of the order for service as well as the bill of lading constitutes furnishing the same information twice, which at first blush would seem to be unnecessary paperwork. Yet a moment's reflection will demonstrate that if the shipper's interests are to be protected by the Commission, as directed by the statute, an obvious and elementary means of checking a carrier's performance would be to enable the shipper to compare the details of the service which he ordered and the carrier undertook to provide with the service actually furnished and charged for. Moreover, with modern methods of word processing (not to speak of the traditional carbon paper) it should be easy for the carrier to prepare both documents at the same time, and note later any change orders. This complaint is meretricious.

■ Petitioners also challenge the regulatory provisions governing non-binding estimates and the handling of consumer complaints. Specifically, petitioners contend that § 1056.3(b) of the regulations, which establishes certain general requirements for *non*-binding estimates of charges given to household goods shippers, violates the statutory prohibition against "prescrib[ing] specific formulas, forms, methods, or techniques for providing a prospective shipper with such an estimate." The legislative history of the Act, however, refutes this contention. Although Congress intended that the Commission not become embroiled in drafting detailed estimate forms, it specifically indicated that the Commission was "not precluded from prohibiting any particular estimate practice that is clearly deceptive." H.R.No.96–1372, *Household Goods Transportation Act of 1980,* 96th Cong., 2d Sess. 11, U.S.Code Cong. & Admin.News 1980, pp. 4271, 4281. The challenged regulations, which merely disallow oral, undocumented estimates that do not reflect the service performed or their non-binding nature, clearly fit within this statutory mandate.

■ Petitioner's argument that § 1056.13 of the regulations, which requires carriers to maintain a written record of all complaints received from a shipper, contravenes the statutory mandate to minimize paper work is similarly without merit. First, the regulation does not require the "massive additional record keeping" alleged by petitioners. By its terms, the regulation pertains only to inquiries or complaints from a shipper relating to a shipment. Mere informational inquiries unrelated to a particular shipment are therefore not covered. Second, far from frustrating the purpose of the statute, this regulation is firmly grounded in the Act. As the Commission noted, "[t]his regulation is necessary to establish the time when possible shipper harm occurred and what actions were taken by the carrier to resolve the matter." 46 Fed. Reg. 17,200 (1980). Indeed, § 2(a)(4) of the Act explicitly states that "strengthening remedies" for shipper harm is one of the goals of the Act.

■ Likewise unmeritorious is the objection to furnishing certain general publications descriptive of practices with regard to the transportation of household goods to shippers whose employers are paying the transportation charges. The information

regarding the performance of the carrier's undertaking is of importance to all shippers whose household *Lares et Penates* are entrusted to the carrier, regardless of who pays the freight. This provision, in fact, was added to the regulations at the instance of consumer groups commenting on the Commission's original draft regulations.

██ Another specious complaint is that directed against the regulation permitting shippers to withhold payment for that proportion of a shipment which is lost or destroyed in transit. As the Commission properly observed, "There is no good reason why the shipper, who has suffered loss, should be made to pay for any service not duly rendered." It is true that disputes might arise as to the percentage of the shipment which was lost or destroyed. There is some force, as a matter of administrative convenience, in petitioners' argument that under the new regulation "It turns the driver into a claims adjuster and a tariff clerk." But carriers by careful record-keeping should be able to minimize disputes of this sort, and collect transportation charges only for such proportion of the shipment as is actually transported. Fairness and justice entitle the carrier to compensation only for services actually performed. The Commission's regulation is proper on principle, and if practical difficulties arise during experience with its application, the Commission will doubtless consider appropriate amendments to make it more workable, without the unjust advantage enjoyed by carriers under the prior practice of permitting 100% collection and use of the shipper's money by the carrier during a 90 day period.

██ The specific substantive regulation most stressed at argument by petitioners as burdensome and objectionable was that permitting the shipper to request a reweigh before unloading and after the shipper is informed of the billing weight and total charges. No objection is made to the propriety of reweighing the shipment. That has apparently long been standard practice. What is feared and thought to be burdensome is permitting the shipper, when the driver is ready to unload, to demand a reweigh out of "momentary ill-will, hostility, pique or sheer capriciousness" at the moment when the driver has reached the destination and is ready to unload.

This also appears to be an imaginary evil. Nothing in the regulation prohibits continuance of what petitioners declare to be the customary industry practice, where the carrier informs the shipper in advance by telephone of the billing weight and charges, and makes arrangements with the shipper to meet at a convenient location for a reweigh, if requested by the shipper. Only where the carrier neglects to inform the shipper of the weight and charges until actual arrival would the regulation permit the shipper to exercise an eleventh hour right to demand reweighing. If the carriers exercise appropriate managerial supervision over their operations no burdensome inconvenience need be anticipated.

██ Finally, petitioners object to the repeal of former regulations 1056.18 (adopted in 1939) and 1056.21 (adopted in 1973, at the instigation of the industry). The former rule prohibited a carrier having operating authority of its own from acting as agent for another carrier having different rates than the agent for the same service. The latter rule prohibited maintenance by a carrier of more than one level of rates for the same service, whether those rates were single-line or joint-line rates.

A distinctive feature of household goods transportation is that a particular shipper's change of residence is not likely to present a recurring traffic pattern or be confined to a particular geographic area. A given shipper might move from Chicago to Boston, then to Dallas, then to San Francisco, at irregular intervals of time between moves. Thus the industry has developed a system of large carriers having nation-wide operating authority. Such companies are represented locally by agents who are often themselves carriers holding a narrower operating authority themselves. They often furnish the equipment and drivers to handle traffic moving under the national carriers' operating authority. In some cases the na-

tional carrier is owned by the agents collectively.

Suppose a Chicago carrier's own operating authority covers the territory between Illinois and Wisconsin. If it solicits a shipment from Chicago to Boston, obviously it must surrender the shipment for transportation under the national carrier's authority, even though it moves in the local agent's equipment. But suppose the local agent is offered a shipment from Chicago to Milwaukee. There are three possible methods of handling such a shipment: (1) The method most consistent with maximizing competition would be to require the local carrier to haul the shipment under its own authority and its own (lower) rates. (2) The method most consistent with anticompetitive economic philosophy would be to require it to turn over all business to the national carrier (its own operating authority would then be like an unutilized patent owned by a company providing a less efficient competitive process). (3) The arrangement between the national carrier and its local agent might be *ad hoc* and based upon convenience. Thus all shipments over 300 miles might have to be surrendered for movement under the national carriers' authority, regardless of whether it lay within the local agent's operating authority; or a particular shipment within the local agent's authority might be turned over because no equipment belonging to the local agent was available at the time, while an empty backhaul of another agent of the national carrier located at the destination of the shipment might be conveniently averted by handling this particular shipment.

There was no evidence before us regarding the customary arrangements in this respect between national carriers and their agents. But it is obvious that if the new philosophy of deregulation is to be promoted, as required by recent legislation,[3] and reliance is to be placed upon competition and "maximum flexibility" on the part of carriers in pricing their services and developing "a variety of quality and price options to meet market demands," then the mandated rate uniformity required by the old regulations 1056.18 and 1056.21 is not in keeping with the policy embodied in currently effective deregulation legislation and should be eliminated.

The Commission clearly recognized the disharmony between these old regulations and the new legislation, and acted accordingly. The Commission stated (45 Fed.Reg. 70942) that: "The requirements of the Section [1056.18] appear to be violative of the intent of the 'Household Goods Transportation Act of 1980' to the extent that future compliance with Section 1056.18 would be contrary to the anti-trust provisions of the Act" and that "The requirements of the Section [1056.21] appear to be anti-competitive and intended to discourage innovative ratemaking." Upon final adoption by the Commission of the new regulations on March 11, 1981, it said: "Deletion of the rules will permit price and service competition between and among principal carriers and their agents. The intention to foster such competition is now part of the National Transportation Policy and was the prime motivation, along with reduced regulation,

---

3. The new "deregulatory" philosophy seeks to promote competition as a stimulus to improved service and lower rates. Even under the prior policy of regulation the effect of competition had to be considered to a certain extent. *McLean Trucking Co. v. U. S.*, 321 U.S. 67, 83–87, 64 S.Ct. 370, 378–80, 88 L.Ed. 544 (1944); *Pittsburgh & New England Trucking Co. v. U. S.*, 345 F.Supp. 743, 749–50 (W.D.Pa. 1972); *Lang Transp. Corp. v. U. S.*, 75 F.Supp. 915, 931 (S.D.Calif.C.D.1948). Enactment over President Truman's veto of the so-called "Bulwinkle bill" by the Act of June 17, 1948, 62 Stat. 472, 49 U.S.C. § 5a, exempting from operation of the antitrust laws rate bureau agreements approved by the Commission, was a

substantial victory for anti-competitive policy. These provisions were repealed and replaced by the stricter requirements of 49 U.S.C. § 10706 by the Act of October 17, 1978, 92 Stat. 1337, 1377, 1468, which prohibit voting by any carrier on single-line rates of another carrier, and voting on joint rates by non-participating carriers, and voting except with respect to a particular single route when two or more interline routes are in existence. Some of these restrictions will not go into force until 1984, and not even then if the Commission postpones their effective date. Section 10706 was amended by section 14(a) of the Motor Carrier Act of 1980 and by section 219(a) of the Staggers Rail Act of 1980.

for enactment of both the new motor carrier and household goods legislation" (46 Fed. Reg. 16212). It is difficult to see how these conclusions can be gainsaid. The Commission very appropriately eliminated those vestiges of the old anticompetitive Bulwinkle philosophy in executing its mandate to "review and revise" its household goods regulations in order to carry out the purposes and policies of the 1980 legislation.

For the foregoing reasons we conclude that the regulations under review are valid, and that the injunctive and other relief sought by petitioners should be denied. The stay heretofore granted by this Court is dissolved. We admonish the Commission, however, that since a reasonable time will be required to put the new regulations into effect, particularly to prepare various printed documents that will be required for distribution to shippers, the Commission should not undertake proceedings for the imposition of penalties for violation of the regulations until an appropriate interval (say 30 days) after the date of entry of judgment in the case at bar.